2023 IL App (1st) 220429-U

THIRD DIVISION
June 21, 2023

No. 1-22-0429

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 07 CR 16031 |
| | ) | |
| TYSHON THOMPSON, | ) | Honorable |
| | ) | Vincent Gaughan, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

PRESIDING JUSTICE McBRIDE delivered the judgment of the court.
Justices Reyes and D. B. Walker concurred in the judgment.

**ORDER**

¶ 1    *Held*:  (1) The State proved defendant guilty of aggravated unlawful use of a weapon beyond a reasonable doubt; (2) defendant's right to a speedy trial was not violated; (3) the aggravated unlawful use of a weapon statute does not violate the second amendment; and (4) no plain error occurred when the trial court inadvertently failed to poll one juror because the evidence was not closely balanced.

¶ 2    Following a jury trial, defendant Tyshon Thompson was convicted of aggravated unlawful use of a weapon (AUUW) and subsequently sentenced to 30 months in prison. On appeal, defendant argues that: (1) the State failed to prove him guilty of AUUW beyond a reasonable doubt; (2) defendant's right to a speedy trial was violated; (3) the AUUW statute is

unconstitutional; and (4) defendant's right to a unanimous verdict was violated when the trial court polled only 11 of the 12 jurors.

¶ 3    Defendant was arrested on March 25, 2020, and subsequently charged by indictment with two counts of aggravated discharge of a firearm and one count of AUUW. In July 2021, defendant's attorney filed a motion to withdraw. At the hearing on the motion, defendant indicated to the trial court that he wished to represent himself. The court allowed counsel to withdraw, but asked another attorney to talk to defendant about the "dangers of representing" himself. Defendant agreed but continued to assert that he wanted to represent himself and requested his discovery. The court informed defendant that he would receive discovery after the court determined defendant was qualified to represent himself. The case was continued.

¶ 4    On August 20, 2021, the court asked defendant if he still wished to represent himself and defendant responded that he did. Before the court would allow defendant to represent himself, the court ordered a behavioral clinical examination (BCX) to determine whether defendant understood the charges pending against him and whether he was capable of representing himself at trial. The court observed that defendant did not "seem to comprehend things" and they were having "difficulty communicating." The court stated that he wanted to get "some resolution" about defendant's ability to represent himself. Defendant objected to the court continuing the case to September 29, 2021.

¶ 5    The results of defendant's BCX, prepared by the forensic clinical services, were filed on September 28, 2021. Defendant was found both fit to stand trial and fit to stand trial *pro se*. The report provided that defendant was "aware of his right to self-representation and [was] not suffering from any mental illness which would impair his ability to stand trial [*pro se*]." At an October 1, 2021 hearing, the trial court again questioned defendant about appearing *pro se*.

Defendant again reiterated that he did not want a public defender to represent him and asserted that he had the right to a speedy trial. The court continued the case until December 2, 2021, "by agreement" to allow defendant time to think about his decision to represent himself and defendant interjected that "This isn't by agreement."

¶ 6     On December 2, 2021, the court asked defendant if he still wanted to represent himself and defendant responded that he did. The court then questioned defendant about his educational history and his understanding of courtroom procedures. The court advised defendant that while he has the right to an attorney, he does not have a right to a standby attorney. Defendant stated that he would need assistance to prepare his defense, but maintained that he wanted to represent himself. The court found that defendant could represent himself. Defendant informed the court that he had mailed motions to the clerk of the court and wanted to have them heard. At the conclusion of the hearing, the trial court continued the case by agreement to determine whether to appoint standby counsel. However defendant objected that he did not agree to a continuance. The court explained that if defendant wanted his motions to be heard, then he could not demand trial.

¶ 7     On December 28, 2021, the trial court again discussed the pitfalls of defendant appearing *pro se* but allowed defendant to represent himself. Defendant then asked for his motions to modify bail and for a speedy trial to be considered. In his motion alleging a speedy trial violation, defendant argued that he demanded trial between August 4, 2020, and February 3, 2021. The State responded that those continuances were all by agreement and that defendant had been represented by private counsel until July 21, 2021. The trial court denied defendant's motion and noted that the supreme court suspended the statutory speedy trial term during the pandemic. Defendant also filed a motion for discovery and requested standby counsel.

¶ 8      On January 5, 2022, the trial court appointed standby counsel to assist defendant. The State tendered approximately 300 pages of discovery to defendant. When the court continued the case by agreement, defendant objected and stated that he was ready for trial. The court noted that defendant demanded trial on the record and advised defendant that he needed to file a written demand for trial. On January 7, 2022, the parties appeared in court, but the State informed the court that it was not ready to proceed to a jury trial. The case was continued, and the court noted that defendant demanded trial.

¶ 9      On February 4, 2022, defendant's trial began with jury selection. The following evidence was presented at trial.

¶ 10     Charice Rush testified that at approximately 10:30 p.m. on March 25, 2020, she was in a vehicle with her niece and nephew near Forest Park, Illinois. Her nephew was driving, Rush was in the front passenger seat, and her niece was seated behind her. They were driving home. As the car was entering the Interstate 290 expressway, she noticed they were being chased. She saw a man pull out a firearm and start shooting at them on the expressway. Her nephew had to swerve out of the way, and they exited the expressway. Someone in the car called 911, but Rush could not remember who called. However, she stated that she thought they were all calling at the same time. She described the other car as a "darkish," SUV or van that was "tall." They were able to get in contact with the Illinois State Police while they were near the Laramie Avenue exit. She denied that she, her nephew, or her niece were armed with a firearm that day. Rush could not recall what kind of car her nephew had at that time.

¶ 11     On cross-examination, Rush stated that prior to the shooting someone was trying to harm her niece while her niece was at work at a gas station in Forest Park. Rush arrived at the gas station after someone "jumped on" her niece. The Forest Park police would not let Rush exit the

car and enter the gas station. Rush left the gas station with her niece and nephew. Another car followed them onto the expressway entrance ramp and was chasing them. Rush was arguing with the occupants of the other car and then someone in that car pulled out a firearm. The vehicle Rush was in sped away to avoid harm. Rush did not see the driver of the other car and did not know if defendant was the shooter. Rush testified that her niece was grazed by a bullet but she did not seek medical treatment, and there were bullet holes in the car from the shooting.

¶ 12     Forest Park Police Officer Benito Marti testified that at approximately 10:30 p.m. on March 25, 2020, he was on duty with Officer Jose Flores and Officer John Reilly when he received a call for a shooting near Harlem on Interstate 290 with the vehicle description. The officers then curbed a white Nissan Rogue off of Interstate 290 that matched the description. He could not identify the driver of that car in court but testified that the last name of the driver was Thompson. Officer Marti testified that the occupants of this vehicle were involved in a prior incident at a Thornton's gas station involving a battery. According to Officer Marti, a fight had occurred at the gas station between 10 and 10:15 p.m. in which a female subject spat at three of the clerks. After the shooting, the female involved in the battery was one of the occupants in the Nissan Rogue.

¶ 13     The officers received a second call of a shooting near Harlem Avenue and Interstate 290 with this vehicle's description. Officer Marti searched the vehicle and recovered a small silver handgun in the glove compartment with blood on the trigger. The vehicle and the firearm were subsequently turned over to the Illinois State Police as part of its investigation. The female passenger was taken into custody for battery and a prior warrant. Officer Marti testified that the Nissan Rogue was stopped twice, once outside the gas station, and later following the shooting. When the driver stepped out of the vehicle, there was a blue rag with blood on it from a cut on

his hand. The driver told the officer that he had been attempting to break up a fight between his girlfriend and the gas station employees.

¶ 14    Forest Park Police Officer John Reilly testified that he was on duty alone at around 11 p.m. on March 25, 2020, but another officer was in front of him in a different car. He curbed a vehicle near the 3600 block of West Chicago Avenue in Chicago. The occupants of this car had previously been involved in an incident at a Thornton's gas station. Officer Reilly had contact with the driver of the car but did not see him in court. He described the car as a white Nissan Rogue with plates "from like a rental car." There were three occupants in the car, two males and one female. The driver's last name was Thompson. A silver handgun was located in the glove compartment of the car and blood was on the trigger of the handgun.

¶ 15    Sergeant Daniel Garcia testified that he was employed as a crime scene investigator with the Illinois State Police. He received a call to the crime scene at approximately 1 a.m. on March 26, 2020, on eastbound Interstate 290, near the Central Avenue exit. Sergeant Garcia photographed the scene and then marked evidence he observed. During his search, he found two fired shell casings. He packaged the evidence and then went to process the victim's vehicle. At that location, he took pictures of the car. He observed a "perforating defect on the passenger side rear door," which meant the bullet "went through the door." Sergeant Garcia identified a photo showing a "trajectory rod" placed in the hole to determine the path of the bullet. In his analysis of the trajectory, he determined there was a "projectile" in the seat. Using a scalpel knife, the seat was cut, and he recovered the projectile.

¶ 16    Sergeant Garcia assisted another team in processing the white Nissan Rogue. From that search, a firearm was collected as well as cell phones and "red blood-like stains." He did not collect a blue rag, but he believed a blue rag which had blood on it was collected. He also

6

collected swabs from the blood on the interior driver's side door and for "touch DNA." The swabs were submitted to the lab.

¶ 17    Trooper Kenan Hasanbegovic testified that he was employed as a trooper with the Illinois State Police and was assigned to the crime scene investigation unit. He was assigned with Sergeant Garcia on March 26, 2020, when they were called to process a scene related to an interstate shooting. After they processed the original scene and the victim's car, they returned to the 11th district police station. At the police station, he administered gunshot residue (GSR) tests on three people in custody, including defendant. Trooper Hasanbegovic identified defendant in court. For the GSR kit, he swabbed the forehand on both hands and sealed it to be submitted to the lab. He then processed the white Nissan Rogue at the Illinois State Police headquarters in Des Plaines. He recovered a firearm and a blue towel with blood like stains. He swabbed the firearm for "touch DNA" and also a red blood-like stain on the trigger. The items were then packed and sealed to be sent to the lab. Trooper Hasanbegovic also created a computer-aided diagram of the scene depicting the eastbound lanes of Interstate 290.

¶ 18    Jennifer Belna testified as an expert in forensic DNA analysis. She was employed at the Illinois Police Forensic Science Center as a forensic scientist in the "bio/DNA" section. She receives evidence and conducts DNA analysis in "blood, semen, [and] saliva." She received the swabs from the firearm and a buccal standard from defendant and conducted a DNA analysis on both items separately. First, Belna confirmed that the firearm swab was blood. She then preserved that evidence and conducted a DNA analysis. After she conducted her analysis on the blood and the buccal standard, she compared the results. She determined that defendant could not be excluded as the major contributor from the swab on the trigger. This profile would occur in approximately 1 in 13 octillion unrelated individuals.

¶ 19    Marc Pomerance testified as an expert in firearms ballistics. He was employed at the Illinois Police Forensic Science Center as an analyst in the firearms and tool marks section. He received one firearm, two fired cartridge cases, and one fired bullet related to the March 25, 2020 shooting. He identified the firearm he examined in March 2020 as an AMT Model Backup .45-caliber semiautomatic handgun as well as the magazine and two unfired .45-caliber cartridges. In his analysis, he fired four test shots to confirm the firearm is working and the test fired bullets and cartridge cases are used for comparison. He did not use the unfired bullets from the firearm for the test shots. Based on his analysis, Pomerance concluded that the fired bullet and shell casings were fired from the recovered .45-caliber firearm. His conclusion was based on his observation of a "reproducing pattern of both class and individual characteristics between the test shots and the two fired cartridge cases."

¶ 20    Kevin Gillespie testified as an expert in trace microscopy and GSR residue. He was employed at the Illinois Police Forensic Science Center as an analyst in the trace chemistry section. He analyzed the GSR kits for defendant and the other occupants of the Nissan Rogue, William Johnson and Nesa Green. The results of Green's GSR test indicated that her left hand was in the environment of a discharged firearm. Johnson's GSR test indicated that his right hand had been in the environment of a discharged firearm. Defendant's GSR test indicated that both of his hands had been in the environment of a discharged firearm. Gillespie testified that while all three GSR kits were positive, the results could not determine which individual discharged a firearm. He further stated that it was possible for GSR to be deposited on multiple people in a close space, such as a sedan or SUV, if one person discharged the firearm.

¶ 21    Sergeant Lee Marks testified that he was assigned to the firearm services bureau with the Illinois State Police and assists with the recordkeeping for Firearm Owner Identification Cards

(FOID cards) and Concealed Carry Licenses (CCL). He explained that any adult over age 21 is eligible for a FOID card absent anything on their record to prohibit their application. An individual must have a valid FOID card to apply for a CCL. He conducted a search of the database for defendant's name and the results showed that defendant did not have a CCL in March 2020 and he had never applied for a CCL. Sergeant Marks found that defendant had applied for and received a FOID card, but it was no longer active due to the charges in this case. He did not search to see if defendant purchased a firearm.

¶ 22    The State then rested its case. Defendant moved for "a judgment of acquittal," which the trial court denied. Defendant indicated that he intended to call Johnson to testify, but Johnson's attorney informed the court that Johnson would be invoking his fifth amendment right to remain silent. Defendant then rested his case without presenting any additional evidence.

¶ 23    Following closing arguments and jury instructions, the jury began its deliberations. During deliberations, the jury sent out four notes. The first note stated, "In the course of securing the gun, were fingerprints taken by the [Illinois State Police] or Forest Park Police and were the fingerprints identified as being either of the two other occupants besides [defendant]?" After discussing the jurors' questions with the parties, the court responded, "Dear Jury, you have heard all of the evidence in this case. Please continue to deliberate." The second note stated, "Was the white Nissan Rogue rented by the defendant?" The court responded that the jury had "heard all of the evidence that was presented at trial." The third note stated, "We are in agreement on the third count and we are hung on the other two counts, one and two." Over defendant's objection, the court responded, "Dear Jury, you're doing a fine job. Again, please continue to deliberate." The fourth and final note indicated that the jury had made a decision on one count, but could not reach a decision on the other two counts. The court proposed calling the jury out and declare a

mistrial on those two counts. The court would then consider the other count. The parties agreed to this proposal.

¶ 24    The jury was called out into the courtroom and it found defendant guilty of AUUW, but did not reach a verdict on the two counts of aggravated discharge of a firearm. Defendant requested that the jurors be polled. The court polled 11 of the jurors and each confirmed the verdict. The court stated that the jury had been polled. The court declared a mistrial on the aggravated discharge of a firearm counts. Defendant asked for an attorney for posttrial motions and sentencing and the court appointed the public defender.

¶ 25    Defendant, through counsel, filed a motion for judgment notwithstanding the verdict and a motion for a new trial, which were denied by the court. Following a sentencing hearing, the trial court sentenced defendant to a term of 30 months in prison. The State moved to *nolle pros* the two counts of aggravated discharge of a firearm, which the court allowed.

¶ 26    This appeal followed.

¶ 27    Defendant first argues that the State failed to prove him guilty of AUUW beyond a reasonable doubt. Specifically, he contends that the State failed to show that defendant carried or otherwise possessed the handgun recovered from the vehicle. The State responds that the jury could have reasonably inferred from the evidence that defendant actually possessed the gun based on his blood on the trigger and the GSR on both of his hands.

¶ 28    When this court considers a challenge to a criminal conviction based upon the sufficiency of the evidence, it is not our function to retry the defendant. *People v. Hall*, 194 Ill. 2d 305, 329-30 (2000). Rather, our inquiry is limited to "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) *Jackson v. Virginia*, 443 U.S. 307,

319 (1979); accord *People v. Cox*, 195 Ill. 2d 378, 387 (2001). It is the responsibility of the trier of fact to "fairly *** resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. "The trier of fact is best equipped to judge the credibility of witnesses, and due consideration must be given to the fact that it was the trial court and jury that saw and heard the witnesses." *People v. Wheeler*, 226 Ill. 2d 92, 114-15 (2007). "Accordingly, a jury's findings concerning credibility are entitled to great weight." *Id.* The reviewing court must carefully examine the record evidence while bearing in mind that it was the fact finder who observed and heard the witnesses. *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004). Testimony may be found insufficient under the *Jackson* standard but only where the record evidence compels the conclusion that no reasonable person could accept it beyond a reasonable doubt. *Id.* "A conviction will not be set aside on appeal unless the evidence is so unreasonable, improbable, or unsatisfactory that there remains a reasonable doubt of the defendant's guilt." *Wright*, 2017 IL 119561, ¶ 70.

¶ 29    To sustain a conviction for AUUW as charged, the State was required to show that the defendant knowingly carried a firearm on or about his or her person or in any vehicle; the firearm possessed was uncased, loaded, and immediately accessible; and the defendant lacked a CCL. See 720 ILCS 5/24-1.6(a)(1), (a)(3)(A-5) (West 2018). Defendant only challenges whether the State proved that defendant carried or otherwise possessed the firearm recovered from the glove compartment of the vehicle.

¶ 30    Defendant first contends that the State's burden of proof to establish carrying a firearm is higher than its burden to establish possession. However, he fails to cite any relevant authority holding that such a difference exists. We are not persuaded by an out-of-context statement from a dissenting opinion relied on by defendant. See *People v. Wise*, 2021 IL 125392, ¶ 65 (Michael J.

Burke, J., dissenting) (in which the justice stated, "I believe there is a distinction between *carrying* and knowingly *possessing*.") (Emphasis in original.) In *Wise*, the defendant had been convicted of unlawful use of a weapon by a felon (UUWF) and argued that the State had failed to prove beyond a reasonable doubt that defendant knowingly possessed the firearm "on or about his person." *Id.* ¶ 22. Nothing in the majority opinion in *Wise* considered whether there is a different burden of proof between carrying versus possessing a firearm. Rather, the dissent was distinguishing the majority's reliance on *People v. Liss*, 406 Ill. 419 (1950), in which the defendant had been charged under a statute that provided, " 'No person shall carry concealed on or about his person a pistol, revolver or other firearm.' " *Id.* at 421 (quoting Ill. Rev. Stat. 1949, ch. 38, ¶ 155). The *Wise* dissent was distinguishing the different statutory language at issue in *Liss* and reasoned that it was not helpful or instructive because *Liss* did not involve constructive possession of a firearm, which was at issue in that case. *Wise*, 2021 IL 125392, ¶ 62. Similarly, defendant's reliance on *People v. Clodfelder*, 172 Ill. App. 3d 1030 (1988), is also misplaced for the same reason. In that case, the Fourth District also distinguished the applicability of *Liss* when considering whether the evidence established that the defendant constructively possessed a gun "on or about" his person. *Id.* at 1032-34. The court did not consider a difference between carrying and possessing a firearm, but observed that the evidence in *Liss* could not support constructive possession of a firearm "on or about" a person. *Id.* at 1033-34.

¶ 31     In his contention, defendant also conflates whether an individual carries or possesses a firearm with the right to keep and bear arms under the second amendment, but fails to cite any relevant authority connecting the second amendment with a different burden between carrying and possessing a firearm. See *People v. Aguilar*, 2013 IL 112116, ¶ 19 (quoting *Moore v. Madigan*, 702 F.2d 933, 936 (7th Cir. 2012) (" 'The right to "bear" as distinct from the right to

"keep" arms is unlikely to refer to the home. *** A right to bear arms thus implies a right to carry a loaded gun outside the home.' "). Further, *Berron v. Illinois Concealed Carry Licensing Review Board*, 825 F.3d 843 (7th Cir. 2016), also cited by defendant, does not support his position. In that case, individuals sued in federal court over the denial of their CCL applications. In rejecting the plaintiffs' argument that the CCL was redundant to the FOID card, the Seventh Circuit reasoned that "the different degrees of danger posed by possessing a weapon at home (the basic license) and carrying a loaded weapon in public (the concealed-carry license) justify different systems." *Id.* at 847. The court observed that the requirement that all CCL applicants complete a firearms-training course was "tailored to situations that those who carry guns in public may encounter" and was "just one of the differences between possessing guns at home and carrying guns in public." *Id.* The *Berron* court did not consider whether a difference existed between carrying and possessing a firearm under the AUUW statute. Moreover, *Berron* suggests that carrying a firearm, as would be permitted with a CCL, would be to possess the gun in public, rather than possessing a firearm in the home. Accordingly, we reject defendant's argument that the State's burden was higher to prove that he carried the firearm rather than he possessed it in a vehicle. Although we conclude that the pertinent issue is whether the State proved that defendant had possession of the firearm in the vehicle, we find that even if there was any distinction between carried or possessed, a reasonable jury would have found defendant guilty of AUUW under either theory.

¶ 32    Further, we observe that the legal definition of the term "carry" involves possession. "Carry," as defined in Black's Law Dictionary, means: "To possess and convey (a firearm) in a vehicle, including the locked glove compartment or trunk of a car." Black's Law Dictionary (11th ed. 2019). Similarly, "possess" is defined as: "To have in one's actual control; to have

possession of." *Id.* Thus, under these definitions, the terms "carry" and "possess" relate to the same action when involving a firearm. And the language of the AUUW statute bears out the same conclusion. 720 ILCS 5/24-1.6 (West 2018).

¶ 33     We therefore begin with the element of possession. Possession of a firearm may be actual or constructive. *People v. Givens*, 237 Ill. 2d 311, 335 (2010). "Actual possession is proved by testimony that the defendant exercised some form of dominion over the firearm, such as that he had it on his person, tried to conceal it, or was seen to discard it." *People v. Jones*, 2019 IL App (1st) 170478, ¶ 27. "[W]here possession has been shown, an inference of culpable knowledge can be drawn from the surrounding facts and circumstances." *Givens*, 237 Ill. 2d at 335. " 'Whether there is knowledge and whether there is possession or control are questions of fact to be determined by the trier of fact.' " *People v. Balark*, 2019 IL App (1st) 171626, ¶ 94 (quoting *People v. Schmalz*, 194 Ill. 2d 75, 81 (2000)).

¶ 34     Viewing the trial evidence in the light most favorable to the State, a rational jury could have found that defendant had carried or otherwise possessed the firearm. The evidence at trial established that defendant was the driver of a white Nissan Rogue at approximately 10:30 p.m. on March 20, 2020. Rush testified that she was a passenger in a vehicle on Interstate 290 when someone from another vehicle fired multiple shots at their vehicle. After police were notified of the shooting, the white Nissan Rogue driven by defendant was curbed by officers within minutes heading east on Interstate 290. Both Officer Marti and Officer Reilly testified that the last name of the Nissan Rogue's driver was Thompson and trial evidence disclosed that defendant was the only occupant with that last name. At the time of his arrest, defendant was bleeding from an injury on a finger. Defendant elicited testimony from Officer Marti that defendant told the officer he had cut his finger while attempting to break up the fight between his girlfriend and the gas

station employees. Blood was found on the interior driver's side of the car as well as on the trigger of the firearm recovered from the glove compartment. This blood on the recovered firearm was likely of recent origin as described in Officer Marti's testimony. DNA analysis established that defendant could not be excluded as the major contributor from the swab on the trigger and this profile would occur in approximately 1 in 13 octillion unrelated individuals. Defendant also tested positive for GSR on both hands, while the two other occupants only showed the presence of GSR on one hand. The recovered shell casings and fired bullet matched the firearm recovered from the Nissan Rogue. Based on this compelling evidence, the jury could have easily concluded that defendant carried or had actual possession of the firearm.

¶ 35    We are not persuaded by defendant's attempts to minimize his DNA on the gun and his positive GSR. Defendant also focuses on the lack of fingerprint testing as a way to contend that the evidence was not sufficient beyond a reasonable doubt that he physically touched the firearm. The jury heard this evidence, and it was within its role as factfinder to assess this evidence. Fingerprint evidence is not required to prove AUUW and its absence does not raise a reasonable doubt. See *People v. Loggins*, 2019 IL App (1st) 160482, ¶ 68; *People v. Hernandez*, 229 Ill. App. 3d 546, 551 (1992). As the supreme court has observed, " 'the trier of fact is not required to disregard inferences which flow normally from the evidence and to search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt.' " *People v. Wheeler*, 226 Ill. 2d 92, 117 (2007) (quoting *Hall,* 194 Ill. 2d at 332). Further, " 'the trier of fact need not *** be satisfied beyond a reasonable doubt as to each link in the chain of circumstances.' " *Id*. (quoting *Hall*, 194 Ill. 2d at 330).

¶ 36    We also reject defendant's assertion that the State and the trial court "recognized the weakness of the State's evidence" based on the State's decision to *nolle* the aggravated discharge

of a firearm counts. Unlike AUUW, to prove aggravated discharge of a firearm, the State had to establish that defendant "knowingly discharged a firearm in the direction of a vehicle." See 720 ILCS 5/24-1.2(a)(2) (West 2018). The prosecutor stated on the record that after reviewing the trial testimony, "none of those witnesses were able to identify this defendant in possession of a firearm at the time of the discharge." As discussed above, possession for AUUW can be proven by circumstantial evidence, *i.e.*, DNA on the trigger of the firearm. Thus, the State's decision on the additional counts had no bearing on the evidence proving AUUW. Similarly, defendant's argument relating to the State's failure to establish constructive possession of the firearm is without merit because the State did not advance a theory of constructive possession. Accordingly, defendant's argument and his reliance on *People v. Wise*, 2021 IL 125392, ¶ 34 (in which the supreme court considered whether the State had proven that the driver of a van had constructive possession of a firearm recovered 5 to 10 feet away from him), is misplaced. Thus, we conclude that the State presented sufficient evidence for a rational jury to find defendant guilty of AUUW beyond a reasonable doubt. We affirm defendant's conviction for AUUW.

¶ 37    Defendant next asserts that his statutory right to a speedy trial was violated when more than 120 days of delay elapsed prior to trial. Specifically, defendant contends that the trial court abused its discretion when it *sua sponte* ordered a BCX to determine whether defendant was fit to represent himself at trial and none of the delays in the case were attributable to him.

¶ 38    The State initially responds that defendant has forfeited this claim by failing to raise it in a posttrial motion. To preserve an issue for review, defendant must object both at trial and in a written posttrial motion. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). However, defendant did allege a speedy trial violation in one of his posttrial motions. Therefore, defendant preserved this claim on appeal.

16

¶ 39    "The right to a speedy trial is fundamental and guaranteed to a defendant under both the sixth amendment and the due process clause of the federal constitution (U.S. Const., amends. VI, XIV; *Klopfer v. North Carolina*, 386 U.S. 213 (1967)), and by article I, section 8, of our state constitution (Ill. Const. 1970, art. I, § 8 ('In criminal prosecutions, the accused shall have the right *** to have a speedy public trial ***.'))." *People v. Mayfield*, 2023 IL 128092, ¶ 18. The legislature has conferred an additional speedy trial right in section 103-5 of the Code, which specifies time periods within which an accused must be brought to trial. *Id*. ¶ 19; see 725 ILCS 5/103-5 (West 2020). Section 103-5(a) of the Code of Criminal Procedure of 1963 sets forth the calculation for the speedy trial term for incarcerated individuals as follows:

> "Every person in custody in this State for an alleged offense shall be tried by the court having jurisdiction within 120 days from the date he or she was taken into custody unless delay is occasioned by the defendant, by an examination for fitness ordered pursuant to Section 104-13 of this Act ***. Delay shall be considered to be agreed to by the defendant unless he or she objects to the delay by making a written demand for trial or an oral demand for trial on the record." 725 ILCS 103-5(a) (West 2020).

¶ 40    "The 120-day period in which a defendant must be tried runs during that time, but the period is tolled during any time when the defendant causes, contributes to, or otherwise agrees to a delay." *Mayfield*, 2023 IL 128029, ¶ 20. "A pretrial delay caused or contributed to by the defendant or otherwise agreed to by him is excluded from the computation of the 120-day period in which a trial must commence under section 103-5(a)." *Id*.

¶ 41    Here, defendant was arrested on March 25, 2020, and remained in custody prior to trial. While defendant was in custody, the Illinois Supreme Court entered administrative orders tolling

the statutory time restrictions during the COVID-19 pandemic. Ill. S. Ct., M.R. 30370 (eff. Apr. 7, 2020). In June 2021, the Illinois Supreme Court amended M.R. 30370 to provide that the statutory time restrictions in section 103-5 shall no longer be tolled beginning October 1, 2021. Ill. S. Ct., M.R. 30370 (eff. June 30, 2021). The order provided that "[a]ll days on and following October 1, 2021, shall be included in speedy trial calculations as contained in section 103-5 of the Code of Criminal Procedure of 1963." *Id*. Defendant does not challenge the time in which his speedy-trial term was tolled by the supreme court order. Thus, defendant's 120-day term began to run on October 1, 2021.

¶ 42    Defendant focuses much of his speedy trial argument on the trial court's decision to *sua sponte* order the BCX and not allow him to represent himself. However, the court ordered the BCX on August 20, 2021, and the results were filed with the court on September 28, 2021, both dates that occurred while the speedy trial term was tolled. Even if the trial court erred in ordering the BCX, which we do not find, the BCX report had no impact on the speedy-trial term and we need not consider this argument in defendant's speedy trial claim.

¶ 43    Instead, this court must review the time period from the beginning of defendant's speedy-trial term, October 1, 2021, until the day trial began, February 4, 2022. Since a total of 126 days elapsed between those dates, we must determine whether any of the delays were attributable to defendant. Defendant contends that because he objected to every continuance and demanded trial, none of the days are attributable to him. The State maintains that some of the days are chargeable to defendant because he filed motions and asked to have the motions considered.

¶ 44    Motions filed by a defendant before trial are ordinarily chargeable to the defendant. *People v. Jones*, 104 Ill. 2d 268, 277 (1984). "Delay has included not only the filing of the motion but also the time associated with processing the motion, including time for the State to

respond and for the court to hear and resolve the issues." *People v. Cross*, 2022 IL 127907, ¶ 21. "[U]nder the plain language of the statute, a delay occasioned by a defendant need not cause or contribute to the postponement of a date set for trial. Rather, any delay occasioned by a defendant causes a postponement of the 120-day speedy-trial term." *Id*. ¶ 23.

¶ 45 Turning to the time frame at issue here, defendant asserted his speedy trial rights at an October 1, 2021 hearing while maintaining his intention to represent himself. The court continued the case until December 2, 2021, "by agreement" to allow defendant time to think about his decision to represent himself and defendant interjected that "This isn't by agreement."

¶ 46 At the December 2, 2021 hearing, the court asked defendant if he still wanted to represent himself and defendant responded that he did, but wanted assistance. The court found that defendant could represent himself. Defendant asked the court if the motions he had filed could be heard. He informed the court that he had mailed the motions to the clerk of the court, but he did not have file stamped copies of the motions. The judge stated that he would continue the case by agreement to determine the standby counsel request and to have defendant's motions heard, but defendant objected that he did not agree. The court explained that if defendant wanted his motions to be heard, then he could not demand trial. At the conclusion of the hearing, the court continued the case "by order of court," and defendant interjected that the continuance was "not by agreement."

¶ 47 On December 27, 2021, defendant filed motions with the court, including a motion for discovery and a motion to dismiss based on a speedy trial violation. On December 28, 2021, the trial court again discussed the pitfalls of defendant appearing *pro se* but allowed defendant to represent himself. Defendant then asked for his motions to modify bail and for a speedy trial to be considered. The trial court denied defendant's motion and noted that the supreme court

suspended the statutory speedy trial term during the pandemic. Defendant discussed his discovery motion and stated that he needed the discovery to prepare his defense. Defendant again requested standby counsel to assist him.

¶ 48　　On January 5, 2022, the trial court appointed standby counsel to assist defendant. The State tendered approximately 300 pages of discovery to defendant. When the court continued the case by agreement, defendant objected and stated that he was ready for trial. The court noted that defendant demanded trial on the record. On January 7, 2022, the parties appeared in court, but the State informed the court that it was not ready to proceed to a jury trial. The case was continued, and the court noted that defendant demanded trial. Defendant's trial began on February 4, 2022.

¶ 49　　Even if we assume that the time from October 1, 2021, to December 1, 2021 is not attributable to defendant, there are more than six days of the 126-day term chargeable to defendant. The State contends that the time between December 1, 2021, and December 28, 2021, as well as the time between December 28, 2021, and January 5, 2022, are chargeable to defendant. We need not reach the time between December 1 and December 28 because we conclude that the 8-day time period from December 28, 2021, to January 5, 2022 is attributable to defendant.[1] As detailed above, at the December 28 hearing, defendant asked the court to

_____

[1] Although we do not find defendant's request for discovery was routine in light of the significant amount of documents tendered by the State in response, we note that routine discovery requests generally do not toll the speedy trial term. See *People v. Stockett*, 355 Ill. App. 3d 523, 526 (2005); *People v. Cotledge*, 2022 IL App (1st) 201209-U, ¶ 91. However, even if defendant's request was considered to be routine, we would still find the delay attributable to defendant because of his request for standby counsel.

appoint standby counsel and moved for discovery.

¶ 50　While defendant argues that none of these periods were attributable to him, he fails to acknowledge that he filed a motion for discovery and requested the appointment of standby counsel. As noted above, a delay includes not only the filing of the motion but also time for the State to respond. *Cross*, 2022 IL 127907, ¶ 21. The State responded to defendant's motion for discovery in a timely manner on January 5, 2022, when it provided him with over 300 pages of discovery. The court also appointed standby counsel on the same date. Because the time between December 28, 2021, and January 5, 2022, concerned defendant's request for discovery and standby counsel, these days were attributable to him. This delay of eight days tolled his speedy trial term and thus, his trial began within the 120-day period. We find no speedy trial violation occurred.

¶ 51　Next, defendant contends that the AUUW statute is unconstitutional because it infringes on an individual's second amendment right to bear arms. Specifically, he asserts that under the United States Supreme Court's recent decision in *New York State Rifle & Pistol Association, Inc. v. Bruen*, ____ U.S. ____, 142 S. Ct. 2111 (2022), the AUUW statute violates his right to open carry a handgun. The State maintains that *Bruen* did not prohibit the State from criminalizing the open carry of firearms without a CCL. We agree.

¶ 52　" 'Constitutional challenges carry the heavy burden of successfully rebutting the strong judicial presumption that statutes are constitutional.' " *People v. Rizzo*, 2016 IL 118599, ¶ 23 (quoting *People v. Patterson*, 2014 IL 115102, ¶ 90). "That presumption applies with equal force to legislative enactments that declare and define conduct constituting a crime and determine the penalties imposed for such conduct." *Id.* " 'To overcome this presumption, the party challenging the statute must clearly establish that it violates the constitution.' " *Id.* (quoting *People v. Sharpe*,

216 Ill. 2d 481, 487 (2005)). "Courts have a duty to uphold the constitutionality of a statute whenever reasonably possible, resolving any doubts in favor of the statute's validity." *Id.*

¶ 53     Defendant challenges the AUUW statute's ban on the open carry of firearms as unconstitutional on its face in violation of the second amendment. A facial constitutional challenge requires a showing that the statute is unconstitutional under any set of facts, *i.e.*, the specific facts related to the challenging party are irrelevant. *Rizzo*, 2016 IL 118599, ¶ 24. A facial challenge to the constitutionality of a statute is the most difficult challenge to mount. *People v. Davis*, 2014 IL 115595, ¶ 25. A statute is facially unconstitutional only if there are no circumstances in which the statute could be validly applied. *Id.* The fact that the statute could be found unconstitutional under some set of circumstances does not establish the facial invalidity of the statute. *Id.* Accordingly, a facial challenge must fail if any situation exists where the statute could be validly applied. *Id.*

¶ 54     At issue in *Bruen* was New York's requirement that a person seeking a pistol license to carry a loaded weapon for self-defense outside of one's home or business was required to show "proper cause," but the term "proper cause" was not defined in any statute. *Bruen*, 142 S. Ct. at 2123. In reviewing this licensing statute, the Court recognized New York as part of a small minority of states that allowed a licensing agency discretion to deny a "concealed-carry license" application, such that they "may issue" a license. *Id.*, 142 S. Ct. at 2123-24. In contrast, Illinois falls in line with the majority of states as a "shall issue" jurisdiction, "where authorities must issue concealed-carry licenses whenever applicants satisfy certain threshold requirements, without granting licensing officials discretion to deny licenses based on a perceived lack of need or suitability." *Id.*, 142 S. Ct. at 2123, n.1 (recognizing Illinois as a "shall issue" jurisdiction in a footnote).

¶ 55    The Supreme Court concluded that the "proper cause" requirement violated the second and fourteenth amendments and re-affirmed that those amendments "protect an individual right to keep and bear arms for self-defense." *Id*., 142 S. Ct. at 2125 (citing *District of Columbia v. Heller*, 554 U.S. 570 (2008) and *McDonald v. Chicago*, 561 U.S. 742 (2010)). Specifically, the court held:

> "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.' " *Id.* at 2126 (quoting *Konigsberg v. State Bar of California*, 366 U.S. 36, 50, n. 10 (1961)).

¶ 56    The Supreme Court reiterated that the second amendment does not grant an unrestricted right to carry firearms by all people and at all times.

> "The Second Amendment guaranteed to 'all Americans' the right to bear commonly used arms in public subject to certain reasonable, well-defined restrictions. *Heller*, 554 U.S. at 581. Those restrictions, for example, limited the intent for which one could carry arms, the manner by which one carried arms, or the exceptional circumstances under which one could not carry arms, such as before justices of the peace and other government officials." *Id.* at 2156.

¶ 57     Further, in a concurring opinion, Justice Alito observed: "Our holding decides nothing about who may lawfully possess a firearm or the requirements that must be met to buy a gun. Nor does it decide anything about the kinds of weapons that people may possess. Nor have we disturbed anything that we said in *Heller* or *McDonald* [], about restrictions that may be imposed on the possession or carrying of guns."

¶ 58     Turning back to the instant case, we find that defendant's facial challenge of the constitutionality of the AUUW statute is not supported by *Bruen*. The *Bruen* court explicitly held that open carry without a license was not mandated under the second amendment.

> "To be clear, nothing in our analysis should be interpreted to suggest the
> unconstitutionality of the 43 States' 'shall-issue' licensing regimes, under which
> 'a general desire for self-defense is sufficient to obtain a [permit].' *Drake v. Filko*,
> 724 F.3d 426, 442 (CA3 2013) (Hardiman, J., dissenting). Because these licensing
> regimes do not require applicants to show an atypical need for armed self-defense,
> they do not necessarily prevent 'law-abiding, responsible citizens' from
> exercising their Second Amendment right to public carry. [*Heller*, 554 U.S. at
> 635.] Rather, it appears that these shall-issue regimes, which often require
> applicants to undergo a background check or pass a firearms safety course, are
> designed to ensure only that those bearing arms in the jurisdiction are, in fact,
> 'law-abiding, responsible citizens.' *Ibid*. And they likewise appear to contain only
> 'narrow, objective, and definite standards' guiding licensing officials,
> *Shuttlesworth v. Birmingham*, 394 U.S. 147, 151 (1969), rather than requiring the
> 'appraisal of facts, the exercise of judgment, and the formation of an opinion,'

*Cantwell v. Connecticut*, 310 U.S. 296, 305 (1940)—features that typify proper-

cause standards like New York's." *Bruen*, 142 S. Ct. at 2138, n.9.

Thus, the *Bruen* court upheld Illinois's laws providing for a CCL application. Nothing in *Bruen*

suggests that open carry is required under the second amendment.

¶ 59    We further find defendant's assertion that Illinois is not a "shall issue" state lacks merit.

He contends that some of the requirements under the Firearm Concealed Carry Act (CCL Act)

(430 ILCS 66/1 *et seq.* (West 2016)), such as the completion of a firearm training course, are

discretionary in nature. However, defendant lacks standing to challenge the requirements under

the CCL Act. To establish standing to challenge the constitutionality of a statute, defendant must

"submit to the challenged policy." *Jackson-Bey v. Hanslmaier*, 115 F.3d 1091, 1096 (1997). In

other words, defendant must have attempted to comply with the Act. However, defendant has not

offered any evidence that he attempted to apply for the license and was subsequently denied one.

Thus, he does not have standing to challenge the CCL Act.

¶ 60    Since the Supreme Court found that Illinois is a "shall issue" state and the CCL Act

comports with the second and fourteenth amendments under *Bruen*, defendant's facial challenge

fails. Accordingly, defendant's AUUW conviction for possession of a firearm in a vehicle

without a CCL is not unconstitutional.

¶ 61    Finally, defendant argues that his fundamental right to a unanimous jury verdict was

violated when the trial court inadvertently failed to poll one juror. After the verdict had been

announced, defendant requested the court poll each of the jurors and the court then only polled

11 of the 12 jurors, each of whom confirmed the verdict. The State responds there was no

evidence that the jury's verdict was not unanimous and the inadvertent error did not prejudice

defendant's right to a unanimous jury.

¶ 62    Defendant admits that he did not preserve this claim for our review. However, he asks this court to review the issue under the plain error doctrine. As previously stated, to preserve an issue for review, defendant must object both at trial and in a written posttrial motion. *Enoch*, 122 Ill. 2d at 186. Failure to do so operates as a forfeiture as to that issue on appeal. *People v. Ward*, 154 Ill. 2d 272, 293 (1992). Supreme Court Rule 615(a) states that "[a]ny error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded. Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court." Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967). The plain error rule "allows a reviewing court to consider unpreserved error when (1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007) (citing *Herron*, 215 Ill. 2d at 186-87). However, the plain error rule "is not 'a general saving clause preserving for review all errors affecting substantial rights whether or not they have been brought to the attention of the trial court.' " *Herron*, 215 Ill. 2d at 177 (quoting *People v. Precup*, 73 Ill. 2d 7, 16 (1978)). Rather, "Illinois's plain error rule is a narrow exception to forfeiture principles." *People v. Jackson*, 2022 IL 127256, ¶ 18.

¶ 63    Defendant carries the burden of persuasion under both prongs of the plain error rule. *People v. Lewis*, 234 Ill. 2d 32, 43 (2009). Defendant asserts that the evidence at trial was closely balanced and this alleged error would qualify as plain error under the first prong. However, "[t]he initial analytical step under either prong of the plain error doctrine is determining whether there was a clear or obvious error at trial." *People v. Sebby*, 2017 IL 119445, ¶ 49.

¶ 64    Defendants have a right to have jurors polled. *Jackson*, 2022 IL 127256, ¶ 21. " '[W]hen a jury is polled, each juror should be questioned individually as to whether the announced verdict is his own.' " *Id.* (quoting *People v. Kellogg*, 77 Ill. 2d 524, 527-28 (1979)). Here, it is undisputed that the trial court polled only 11 of the 12 jurors. Thus, the court committed a clear or obvious error. See *id.* Since defendant has only alleged plain error under the first prong, we next determine whether the evidence was closely balanced such that the error could have tipped the scales.

¶ 65    "Under the first prong of the plain error rule, when the evidence of a defendant's guilt is closely balanced, there is the possibility that an innocent person may have been convicted because of some error which is obvious in the record, but which was not properly preserved for review." (Citation omitted.) *Jackson*, 2022 IL 127256, ¶ 23. "[E]rrors reviewable under the first prong of the plain error rule are the type of errors that are subject to harmless error analysis, and a defendant must establish prejudice resulting from the error to excuse his forfeiture of such an error." *Id.* "That is, the defendant must show both that there was plain error and that the evidence was so closely balanced that the error alone severely threatened to tip the scales of justice against him. The State, of course, can respond by arguing that the evidence was not closely balanced, but rather strongly weighted against the defendant." *People v. Herron*, 215 Ill. 2d 167, 187 (2005).

¶ 66    In determining whether the evidence was closely balanced, a reviewing court evaluates the totality of the evidence and conducts a qualitative, commonsense assessment of the evidence within the context of the case. *Sebby*, 2017 IL 119445, ¶ 53. According to defendant, the evidence was closely balanced based on the jury notes "inquiring about evidence pertaining to who possessed and was in control of that weapon." He also relies on the jury's inability to reach a verdict on the aggravated discharge of a firearm counts and contends again that the State

conceded that it did not prove that defendant possessed the firearm at the time of the shooting. We have already considered and rejected defendant's argument relating to the aggravated discharge of a firearm counts and need not reach this claim again.

¶ 67     During deliberations, the jury sent out four notes. The first two involved questions about potential evidence: first asking if fingerprints were taken from the firearm and if the fingerprints matched either of the two other occupants besides defendant, and later asking if the white Nissan Rogue was rented by defendant. The final two notes reflected that the jury was deadlocked on two counts but were in agreement on the third count. Lengthy deliberations and jury notes do not require a finding that the evidence was closely balanced. *People v. Nugen*, 399 Ill. App. 3d 575, 584 (2010). We reject defendant's argument that the jury's notes alone indicated that the evidence was closely balanced on the AUUW count. Instead, we find that the jury's notes during deliberations merely reflect that the jury took its job seriously and conscientiously worked to come to a just decision. *People v. Minniweather*, 301 Ill. App. 3d 574, 580 (1998).

¶ 68     As thoroughly detailed above, the evidence at trial was not closely balanced. Defendant was the driver of a white Nissan Rogue at approximately 10:30 p.m. on March 20, 2020. Someone from the vehicle defendant was driving fired multiple shots at another car on Interstate 290. Multiple police officers curbed the Nissan Rogue driven by defendant within minutes of the shooting. Two officers identified the driver of the Nissan Rogue by the last name Thompson and trial evidence disclosed that defendant was the only occupant with that last name. Further, defendant was bleeding from an injury on a finger when he was arrested. He subsequently admitted to one of the officers that the blood was on his finger from the earlier altercation at the gas station. Blood was found on the trigger of the recovered firearm and defendant could not be excluded as the major contributor from the swab on the trigger. This profile would occur in

28

approximately 1 in 13 octillion unrelated individuals. Defendant also tested positive for GSR on both hands, while the two other occupants only showed the presence of GSR on one hand. The recovered shell casings from the interstate and a fired bullet from the victim's car matched the firearm recovered from the Nissan Rogue. This evidence overwhelmingly supports the jury's guilty verdict for the AUUW count. Since the evidence was not closely balanced, the trial court's error in failing to poll one juror was not plain error and defendant's claim fails. Because defendant did not challenge this error under the second prong of the plain error doctrine, we need not reach whether the record demonstrated a unanimous verdict.

¶ 69    Based on the foregoing reasons, we affirm the decision of the circuit court of Cook County.

¶ 70    Affirmed.