2024 IL App (3d) 210073

Opinion filed March 1, 2024

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2024

| | |
|---|---|
| SINNISSIPPI ROD & GUN CLUB, INC. and SIMON EICHELBERGER, | Appeal from the Circuit Court of the 14th Judicial Circuit, Whiteside County, Illinois. |
| Plaintiffs-Appellants, | |
| v. | Appeal No. 3-21-0073 Circuit No. 19-MR-151 |
| KWAME RAOUL, in His Official Capacity as Attorney General; and BRENDAN F. KELLY, in His Official Capacity as Director of the Illinois State Police, | |
| | Honorable Patricia Ann Senneff, |
| Defendants-Appellees. | Judge, Presiding. |

JUSTICE HETTEL delivered the judgment of the court, with opinion.
Justice Albrecht specially concurred in the judgment, with opinion.
Justice Holdridge dissented in the judgment, with opinion.

**OPINION**

¶ 1 Plaintiffs—Sinnissippi Rod & Gun Club, Inc., and one of its members, Simon Eichelberger—filed a complaint in the circuit court of Whiteside County against defendants— Illinois Attorney General Kwame Raoul and Illinois State Police Director Brendan F. Kelly— challenging the constitutionality of the criminal code restrictions that prohibit them from openly carrying a firearm in public. Specifically, plaintiffs requested a declaration that the concealed carry provisions under section 24-1(a)(10) of the unlawful use of weapons (UUW) statute (720 ILCS

5/24-1(a)(10) (West 2020)) and section 24-1.6(a) the aggravated unlawful use of weapon (AUUW) statute (*id.* § 24-1.6(a)) were unconstitutional under the second amendment of the United States Constitution (U.S. Const., amend. II). The trial court found that there was no genuine issue of material fact regarding the constitutionality of the statutory scheme and granted defendants' motion for summary judgment. Applying the text-and-history test recently advanced in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. ___, ___, 142 S. Ct. 2111, 2120 (2022), we conclude that the public carry restrictions imposed under the UUW and the AUUW do not violate the second amendment and affirm.

¶ 2                                 I. BACKGROUND

¶ 3        In 2013, the Illinois General Assembly enacted the Firearm Concealed Carry Act (Concealed Carry Act) (430 ILCS 66/1 *et seq.* (West 2020)) allowing law-abiding citizens to obtain a license to carry a concealed firearm in public, so long as individuals seeking licensure satisfy certain objective criteria. See Pub. Act 98-63 (eff. July 9, 2013). To qualify for a license, applicants must be at least 21 years of age, possess a valid card under the Firearm Owners Identification Card Act (430 ILCS 65/0.01 *et seq.* (West 2020)), complete firearm training, and avoid criminal conviction for offenses involving violence or driving while under the influence within five years preceding his or her application. 430 ILCS 66/25 (West 2020). So long as these statutory requirements are met, the applicant provides necessary documentation and fees, and a review board determines the applicant is not a danger to himself or the public, the Illinois State Police "shall issue" a license to carry a concealed firearm.[1] *Id.* § 10(a).

---

[1]The Concealed Carry Act defines "concealed firearm" as "a loaded or unloaded handgun carried on or about a person completely or mostly concealed from view of the public or on or about a person within a vehicle." 430 ILCS 66/5 (West 2020).

¶ 4 A concealed carry license permits a licensee to publicly carry a loaded or unloaded firearm, on or about his or her person, fully or partially concealed from the view of the public. *Id.* § 10(c)(1). A licensee may also keep or carry a firearm on or about his or her person within a vehicle. *Id.* § 10(c)(2). The concealed carry licensing regime, however, does not allow an individual to openly carry a firearm in public.

¶ 5 Two provisions in Criminal Code of 2012 (Criminal Code) (720 ILCS 5/1-1 *et seq.* (West 2020)) proscribe the open carriage of firearms in public. Section 24-1(a)(10) of the Criminal Code provides that a person commits the offense of unlawful use of weapons when he or she knowingly "[c]arries or possesses on or about his or her person, upon any public street, alley, or other public lands within the corporate limits of a city, village, or incorporated town, *** any pistol, revolver, stun gun, or taser or other firearm" without a "currently valid license under the Firearm Concealed Carry Act." *Id.* § 24-1(a)(10). Similarly, section 24-1.6(a) of the Criminal Code[2] states that a person commits the offense of aggravated unlawful use of a weapon when he or she knowingly "[c]arries or possesses on or about his or her person, upon any public street, alley, or other public lands within the corporate limits of a city, village or incorporated town," any "pistol, revolver, or handgun" and "has not been issued a currently valid license under the Firearm Concealed Carry Act." *Id.* § 24-1.6(a)(2), (a)(3)(A-5); (a)(2), (a)(3)(B-5) (West 2020).

¶ 6 Eichelberger and other members of Sinnissippi Rod & Gun Club have complied with Illinois's Concealed Carry Act and possess licenses to carry concealed firearms in public.

---

[2]Previous provisions of the AUUW (720 ILCS 5/24-1.6(a) (West 2020)) statute have been successfully challenged and deemed unconstitutional by the Illinois Supreme Court. In 2013, the court held, in *People v. Aguilar*, 2013 IL 112116, ¶¶ 20-21, that the AUUW's provision criminalizing possession of an operable firearm for self-defense outside the home was a categorical ban in violation of an individual's right to keep and bear arms. Provisions criminalizing firearm carriage in a vehicle and in certain public contexts were deemed facially unconstitutional two years later in *People v. Mosley*, 2015 IL 115872, and *People v. Burns*, 2015 IL 117387.

Eichelberger and other members are also National Rifle Association certified firearms instructors and Illinois certified concealed carry license instructors.

¶ 7    In November 2019, Sinnissippi Rod & Gun Club and Eichelberger filed a complaint for declaratory relief against defendants, requesting a declaration that sections 24-1(a)(10) and 24-1.6(a) of the Criminal Code were unconstitutional to the extent they prevented "otherwise qualified Illinois residents" from openly carrying firearms in public. In their complaint, plaintiffs facially challenged the concealed carry restrictions under the UUW and AUUW statutes and asserted that Eichelberger and other gun club members would "carry a loaded and functional handgun openly in public for self-defense and defense of others, but they refrain from doing so because they fear arrest and prosecution."

¶ 8    The parties agreed that no genuine issue of material fact existed and filed cross-motions for summary judgment. Plaintiffs claimed that *District of Columbia v. Heller*, 554 U.S. 570 (2008), controlled the issue. They argued that *Heller* stands for the proposition that open carry is constitutionally permitted and maintained that the open carry of firearms remains "the ultimate human right" because it is "the mode that best effectuates" the right of self-defense. Defendants argued that there is no second amendment right to openly carry firearms in public. In the alternative, defendants maintained that, even if concealed carry laws fell within the scope of the second amendment, the statutory scheme passed intermediate scrutiny because concealed carry restrictions are substantially related to important public safety interests. The trial court found the concealed carry restrictions constitutional and granted defendants' motion for summary judgment.

4

## II. ANALYSIS

### A. The *Bruen* Decision

In June 2022, the United States Supreme Court decided *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. ___, 142 S. Ct. 2111 (2022). In *Bruen*, the Court reviewed a provision of New York's concealed carry statute requiring an applicant to demonstrate a heightened need for self-defense or "proper cause" to obtain a license. N.Y. Penal Law § 400.00(2)(f) (McKinney 2020). New York justified the proper-cause requirement as "substantially related to the achievement of an important governmental interest," preventing gun violence. (Internal quotation marks omitted.) *Bruen*, 597 U.S. at ___, 142 S. Ct. at 2125. Relying on the established jurisprudence of *Heller* and *McDonald v. City of Chicago*, 561 U.S. 742 (2010), the Court held that the second and fourteenth amendments' protection of the "right of an ordinary, law-abiding citizen to possess a handgun in the home for self-defense" extended to "carry[ing] a handgun for self-defense outside the home." *Bruen*, 597 U.S. at ___, 142 S. Ct. at 2122; see *Heller*, 554 U.S. at 636 (holding that the second amendment guarantees law abiding citizens the right to possess a handgun in the home for self-defense); *McDonald*, 561 U.S. at 786 (incorporating the same understanding of the second amendment to the states through the fourteenth amendment). The Court also referenced, with approval, *Heller*'s historical understanding of the amendment to demark the limits on the exercise of that right:

> "Like most rights, the right secured by the Second Amendment is not unlimited. From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.... [N]othing in our opinion should be taken to cast doubt on longstanding

prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." (Internal quotation marks omitted.) *Bruen*, 597 U.S. at ___, 142 S. Ct. at 2162 (Kavanaugh, J., concurring, joined by Roberts, C.J.).

¶ 12　　　Following a review of firearm regulations from 1791 through 1890, the court struck down New York's discretionary licensing scheme, concluding that the second amendment guarantees "the right to bear commonly used arms in public subject to certain reasonable, well-defined restrictions." *Id.* at ___, 142 S. Ct. at 2156 (majority opinion). Notably, however, the Court found no fault with the nondiscretionary "shall-issue" licensing schemes adopted by 43 other states, including the Concealed Carry Act plaintiffs challenge here. See *id.* at ___, 142 S. Ct. at 2123 n.1 (enumerating 43 "shall-issue" state statutes, including section 10 of Illinois's Concealed Carry Act); *id.* at ___, 142 S. Ct. at 2123 (noting "the vast majority of States—43 by our count—are 'shall issue' jurisdictions, where authorities must issue concealed-carry licenses whenever applicants satisfy certain threshold requirements, without granting licensing officials discretion to deny licenses based on a perceived lack of need or suitability"); *id.* at ___ n.9, 142 S. Ct. at 2138 n.9 (emphasizing that "nothing in or analysis should be interpreted to suggest the unconstitutionality of the 43 States' 'shall-issue' licensing regimes").

¶ 13　　　In ruling that New York's proper-cause requirement infringed on an individual's right to public carry under the second amendment, the Court held that the constitutionality of a firearm regulation depends solely on whether the restriction is consistent with "the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at ___, 142 S. Ct. at 2127.

*Bruen* then set forth a new test courts must conduct when evaluating a second amendment challenge:

"When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.' " *Id.* at ___, 142 S. Ct. at 2129-30 (quoting *Konigsberg v. State Bar of California*, 366 U.S. 36, 49 n.10 (1961)).

This text-and-history standard is a two-part inquiry. The first inquiry is: Does the plain text of the second amendment cover an individual's conduct? *Id.* If not, the regulation is constitutional because it falls outside the scope of protection. But if it does, the individual's conduct is presumptively protected by the second amendment, and we move to the second inquiry: Is the State's regulation "consistent with the Nation's historical tradition of firearm regulation[?]" *Id.*

¶ 14      In their supplemental briefs, plaintiffs argue that the concealed carry provisions of the UUW and the AUUW statutes amount to a "categorical denial" of their right to bear arms under the second amendment and are therefore inconsistent with America's history of second amendment liberties. Defendants maintain that the statutes at issue do not implicate the second amendment and, alternatively, if they do, the regulations are consistent with historical tradition.

¶ 15      B. Applying the New Text-and-History Test

¶ 16      1. *Is Plaintiffs' Conduct Covered by the Second Amendment?*

¶ 17      The second amendment provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S.

Const., amend. II. In *Heller*, the Supreme Court held that the natural connotation of "bear [a]rms" means "wear, bear, or carry ... upon the person or in the clothing or in a pocket, for the purpose ... of being armed and ready for offensive or defensive action in a case of conflict with another person." The Court declared that the right to possess and carry weapons for defense of the home was a protected second amendment right. (Internal quotation marks omitted.) *Heller*, 554 U.S. at 584, 636.

¶ 18   The Illinois Supreme Court extended that right outside the home in *People v. Aguilar*, 2013 IL 112116, ¶ 21. In *Aguilar*, our supreme court recognized that "the second amendment protects the right to possess and use a firearm for self-defense outside the home" and found section 24-1.6(a)(1), (a)(3)(A) of the AUUW statute, which prohibited carrying a loaded firearm in public, to be unconstitutional. *Id.* ¶¶ 21-22.

¶ 19   In *Bruen*, the United States Supreme Court agreed that second amendment protections include the rights of individuals to possess and carry handguns outside the home for self-defense:

> "In *District of Columbia v. Heller* [citation], and *McDonald v. Chicago* [citation], we recognized that the Second and Fourteenth Amendments protect the right of an ordinary, law-abiding citizen to possess a handgun in the home for self-defense. In this case, petitioners and respondents agree that ordinary, law-abiding citizens have a similar right to carry handguns publicly for their self-defense. We too agree, and now hold, consistent with *Heller* and *McDonald*, that the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home." *Bruen*, 597 U.S. at ___, 142 S. Ct. at 2122.

¶ 20   Plaintiffs claim that Illinois's criminalization of the public carriage of firearms infringes on their right to carry a handgun in public for self-defense. Following *Heller*, *Aguilar*, and

*Bruen*, the rights expressed in the second amendment include the right to carry commonly used firearms in public, subject to reasonable government restriction. See *id.* at ___, 142 S. Ct. at 2156. Plaintiffs argue, however, that the protections provided by the second amendment should be extended to include a particular *manner* of public carriage. We find the resolution of this issue unnecessary. Even if we assume plaintiffs' proposed conduct is covered by the second amendment, the challenged regulations are historically justified under the second part of the *Bruen* analysis.

¶ 21      *2. Is the State's Regulation Consistent with the Nation's*

*Tradition of Firearm Regulation?*

¶ 22      At the second step, the burden shifts to the State to demonstrate that regulating the manner of public carriage by requiring a concealed carry license is "consistent with this Nation's historical tradition of firearm regulation." *Id.* at ___, 142 S. Ct. at 2126.

¶ 23      To demonstrate that a challenged restriction is consistent with America's historical tradition of firearm regulation, the government may identify historical regulations that are "distinctly similar" to the regulation at issue or use "analogical reasoning." *Id.* at ___, 142 S. Ct. at 2131-32. As explained in *Bruen*, most cases "will often involve reasoning by analogy." *Id.* at ___, 142 S. Ct. at 2132. Inquiry by analogy is not intended to impose a "regulatory straightjacket nor a regulatory blank check." *Id.* at ___, 142 S. Ct. at 2133. Reasoning by analogy "requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*." (Emphases in original.) *Id.* at ___, 142 S. Ct. at 2133. "Like all analogical reasoning, determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are

9

'relevantly similar.' " *Id.* at ___, 142 S. Ct. at 2132 (quoting Cass R. Sunstein, *On Analogical Reasoning*, 106 Harv. L. Rev. 741, 773 (1993)).

¶ 24    In determining whether the regulation at issue and historical tradition are "relevantly similar," courts should consider "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at ___, 142 S. Ct. at 2132-33. Considerations of how and why translate into two primary factors: (1) how—whether modern and traditional laws impose a "comparable burden" on the right to carry firearms for self-defense—and (2) why—whether that burden is "comparably justified." See *id.* at ___, 142 S. Ct. at 2133 ("[W]hether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are ' "*central*" ' considerations when engaging in an analogical inquiry. [Citation.]" (Emphasis in original.)).

¶ 25    According to *Bruen*, the best way to conduct an historical analogue is by understanding the scope of the second amendment when it was adopted in 1791 through the ratification of the fourteenth amendment in 1868 and the Reconstruction Period. *Id.* at ___, 142 S. Ct. at 2136. Courts should examine "a variety of legal and other sources" in early American history to determine the public understanding of the second amendment. (Internal quotation marks omitted.) *Id.* at ___, 142 S. Ct. at 2127-28; *Heller*, 554 U.S. at 605. Those sources include (1) English practices that prevailed immediately before and after the framing of the Constitution; (2) similar rights to bear arms in state constitutions during the adoption of the second amendment; (3) public understanding of the right to keep and bear arms at the time the second amendment was enacted in 1791, as well as when the fourteenth amendment was ratified in 1868; and (4) interpretation of the second amendment from 1791 through the end of the nineteenth century. *Bruen*, 597 U.S. at ___, 142 S. Ct. at 2127-28.

¶ 26    However, as is evident from a study of *Bruen* and the cases that have followed, historical analysis is not always easy; it can be difficult and nuanced. See *id.* at ___, 142 S. Ct. at 2130; see also *Firearms Policy Coalition, Inc. v. McCraw*, 623 F. Supp. 3d 740 (N.D. Tex. 2022) (finding state statute prohibiting 18- to 20-year-olds from carrying a handgun unconstitutional under *Bruen*); *United States v. Rahimi*, 61 F.4th 443 (5th Cir. 2023) (finding federal statute prohibiting possession by individual subject to domestic violence restraining order unconstitutional under *Bruen*); *United States v. Hill*, No. H-22-249, 2022 WL 17069855 (S.D. Tex. Nov. 17, 2022) (finding federal statute criminalizing possession of a firearm by a felon constitutional under *Bruen*); *Frey v. Nigrelli*, 661 F. Supp. 3d 176 (S.D.N.Y. 2023) (denying injunctive relief and concluding plaintiffs were unlikely to succeed in their challenge of state statute banning public carriage under *Bruen*); *United States v. Jackson*, No. ELH-22-141, 2023 WL 2242873 (D. Md. Feb. 27, 2023) (holding federal statute criminalizing possession while under indictment constitutional under *Bruen*). In conducting a review, a precise match between a current law and historical regulation is not required. "[E]ven if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Bruen*, 597 U.S. at ___, 142 S. Ct. at 2133.

¶ 27    Following the *Bruen* framework, the historical regulations cited by the State do not provide a "distinctly similar" statute that is, to quote *Bruen*, a "dead ringer" for Illinois's concealed carry statutory scheme. By analogy, however, the State provides a plethora of evidence that regulating the manner of public carriage comports with historical tradition.

¶ 28    As the State maintains, the historical record from the founding era to the ratification of the fourteenth amendment consistently demonstrates a tradition of restricting the manner of public carriage. The United States Supreme Court recognized this long-standing custom in

11

*Heller*, citing a robust historical tradition of regulating the right to "bear arms." See *Heller*, 554 U.S. at 626. In *Heller*, the Court explained that "[f]rom Blackstone through the 19th-century cases, commentators and courts routinely explained that the right [to keep and bear arms] was not a right to keep and carry any weapon whatsoever in *any manner* whatsoever." (Emphasis added.) *Id.* And in *Bruen*, the Court reiterated, if not emphasized, that public carriage has historically been subject to reasonable restrictions. See *Bruen*, 597 U.S. at ___, 142 S. Ct. at 2128 (declining to declare second amendment right to public carriage of weapons in "*any manner* whatsoever" (emphasis added and internal quotation marks omitted)); *id.* at ___, 142 S. Ct. at 2138 (emphasizing that the right to keep and bear arms in public has traditionally been subject to well-defined restrictions); *id.* at ___, 142 S. Ct. at 2150 (noting that historical tradition from the Antebellum period demonstrated that "*the manner* of public carry was subject to reasonable regulation" (emphasis in original)); *id.* at ___, 142 S. Ct. at 2156 (concluding that "through the Anglo-American history of public carry," the second amendment has been subject to restrictions that "limited the intent for which one could carry arms, *the manner* by which one carried arms, or the exceptional circumstances under which one could not carry arms" (emphasis added)); see also *id.* at ___, 142 S. Ct. at 2157 (Alito, J., concurring) (emphasizing that the Court's decision did not disturb "anything that we said in *Heller* or *McDonald* [citation], about restrictions that may be imposed on the possession or carrying of guns"); *id.* at ___, 142 S. Ct. at 2162 (Kavanaugh, J., concurring, joined by Roberts, C.J.) (reiterating the holdings in *Heller* and *McDonald* that the right to keep and bear arms does not guarantee the right to carry a weapon in " '*any manner whatsoever*' " (emphasis added) (quoting *Heller*, 554 U.S. at 626)).

¶ 29      More specifically, as cited by the State, various forms of public carry restrictions proliferated across our newly formed Nation after ratification of the second amendment in 1791.

Between 1791 and the middle of the nineteenth century, several states enacted laws that restricted, and even banned, the public carriage of pistols and other small weapons.[3] As recognized in *Heller* and repeated in *Bruen*, " 'the majority of the 19th-century courts to consider the question held that [these] prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues.' " *Bruen*, 597 U.S. at ___, 142 S. Ct. at 2146 (quoting *Heller*, 554 U.S. at 626).[4]

¶ 30 Plaintiffs argue that historical laws demonstrate a tradition of requiring open carry because they proscribed the concealed carry of handguns. However, a review of the cases considering those laws demonstrates that *allowing open carry* while *prohibiting concealed carry* was not the crucial factor in determining whether the restrictions passed constitutional muster. In the vast majority of those cases, courts struck down statutes that categorically prohibited the public carriage of firearms, both open and concealed, and ruled that the second amendment permitted limited restriction but not a complete ban. Courts concluded that the government could lawfully eliminate one kind of public carry to protect and ensure the safety of its citizens, so long as the people were permitted to carry weapons in another manner that allowed self-defense. The constitutional emphasis in those cases was the nature of the restriction—categorical (unconstitutional) versus limited (constitutional)—rather than open versus concealed. See *State v. Mitchell*, 3 Blackf. 229 (Ind. 1833) (Indiana Supreme Court upheld Indiana law restricting

---

[3]In the early to mid-1800's, states began enacting laws that proscribed the concealed carry of small weapons or banned individuals from carrying weapons in public altogether. See 1795 Mass. Acts 436; 1801 Tenn. Pub. Acts 259, 260-61; 1813 Ky. Acts 100; 1813 La. Acts 172; 1820 Ind. Acts 39; 1821 Me. Laws 285; 1821 Tenn. Pub. Acts 15; 1838 Ark. Rev. Stat. § 13, p. 280; 1837 Ga. Acts 90; 1838 Va. Acts 76; 1839 Ala. Acts 67; 1859 Ohio Laws 56; 1860 N.M. Laws 94. *Bruen* also cites two additional statutes enacted in Tennessee in 1821 and the territory of Florida in 1835. See *Bruen*, 597 U.S. at ___ n.16, 142 S. Ct. at 2146 n.16.

[4]Both *Bruen* and *Heller* cited *State v. Mitchell*, 3 Blackf. 229 (Ind. 1833); *State v. Reid*, 1 Ala. 612, 616 (1840); *State v. Buzzard*, 4 Ark. 18 (1842); *Nunn v. State*, 1 Ga. 243 (1846); *State v. Chandler*, 5 La. Ann. 489 (1850); *State v. Smith*, 11 La. Ann. 633 (1856); *State v. Jumel*, 13 La. Ann. 399 (1858).

public carriage of handguns); *State v. Buzzard*, 4 Ark. 18, 22 (1842) (Arkansas Supreme Court held that restricted carry was constitutional, concluding that "the [second amendment] right in question possesses no such immunity as exempts it from all legal regulation and control"); *State v. Chandler*, 5 La. Ann. 489, 490 (1850) (Louisiana Supreme Court upheld state statute restricting manner of public carry because statute did not categorically ban public carriage in that it did not interfere with the right to carry arms in another manner); *State v. Jumel*, 13 La. Ann. 399, 399-400 (1858) ("The statute in question does not infringe the right of people to keep or bear arms. It is a measure of police, prohibiting only a particular mode of bearing arms which is found dangerous to the peace of society." (Emphasis omitted.)).

¶ 31        Moreover, the United States Supreme Court's decision in *Bruen* "does not prohibit States from imposing licensing requirements" for concealed carry of a handgun for self-defense. *Bruen*, 597 U.S. ___, 142 S. Ct. at 2161 (Kavanaugh, J., concurring, joined by Roberts, C.J.) ("[T]he Court's decision does not prohibit States from imposing licensing requirements for carrying a handgun for self-defense."). Of relevance here, *Bruen* specifically noted that "these antebellum state-court decisions evince a consensus view that [s]tates could not altogether prohibit the public carry of 'arms' protected by the Second Amendment or state analogues." *Id.* at ___, 142 S. Ct. at 2147 (majority opinion) (explaining that historical cases demonstrated that the second amendment right to bear arms publicly was subject to limits on *the manner* of carriage).

¶ 32        Further, the history of the colonies and the early Republic demonstrate common practices of regulating public carry by the general public to prevent "fear" and "terror." See 1692 Mass. Acts and Laws no. 6, pp. 11-12; 1699 N.H. Laws ch. 1 ("all Affrayers, Rioters, Disturbers, or Breakers of the Peace, and such as shall ride or go armed Offensively...by Night or by Day, in Fear or Affray of Their Majesties Liege People"); see also Collection of All Such Acts of the

14

General Assembly of Virginia, ch. 21, p. 33 (1794) ("no man, great nor small, [shall] go nor ride armed by night nor by day, in fairs or markets, or in other places, in terror of the County"). Moreover, during the 1800s, states commonly regulated the manner in which individuals carried a firearm in public to reduce violence and protect the public. See generally *Chandler*, 5 La. Ann. at 489-90 (law restricting manner of carriage was "absolutely necessary to *** prevent bloodshed and assassinations"); *Carroll v. State*, 28 Ark. 99, 101 (1872) (holding that it was "not unreasonable" for the legislature to restrict the manner of public carriage based on public safety concerns); *State v. Speller*, 86 N.C. 697, 700 (1882) (finding public carry restriction constitutional because it did not impose a complete ban and its goal was to promote the "peace and safety of the public").

¶ 33    In sum, a review of the analogous statutes and cases between the ratification of the second amendment and the late nineteenth century reveals that while a categorical prohibition on public carriage of firearms unquestionably violated an individual's right to keep and bear arms (*Andrews v. State*, 50 Tenn. 165, 187 (1871)), laws prohibiting one manner of carriage while allowing another did not (*Mitchell*, 3 Blackf. 229; *Buzzard*, 4 Ark. at 22; *Chandler*, 5 La. Ann. at 490; *Jumel*, 13 La. Ann. at 399-400). Numerous states regulated the manner of public carriage, and these laws were widely enforced. See *State v. Click*, 2 Ala. 26, 29 (1841); *Walls v. State*, 7 Blackf. 572, 573 (Ind. 1845); *Hicks v. Commonwealth*, 48 Va. 597, 598-99 (1850); *Jackson v. State*, 12 Ga. 1, 5 (1852); *State v. Smith*, 11 La. Ann. 633, 634 (1856); *Commonwealth v. McClanahan*, 59 Ky. 8, 10 (1859); *State v. Stanford*, 20 Ark. 145, 146 (1859). In fact, through the end of the nineteenth century, courts "almost universally held that the legislature may regulate and limit the mode of carrying arms." *Commonwealth v. Murphy*, 44 N.E. 138, 138 (Mass. 1896) (citing antebellum state courts that upheld statutes regulating the manner of public

carriage).[5] Like its historical counterparts, section 24-1(a)(10) of the UUW statute and section 24-1.6(a) of the AUUW statute lawfully regulate the manner of public carriage. Illinois's concealed carry licensing requirement lawfully regulates the right to bear arms for self-defense by proscribing one manner of carriage and permitting another. As long as the regulation does not compel "an absolute ban" that imposes a significant burden on the right of self-defense, the statute passes constitutional muster. See *Bruen*, 597 U.S. at ___, 142 S. Ct. at 2128 (reviewing founding era historical precedent from *Heller*). Here, the criminal statutes regulating open carriage and the referenced Concealed Carry Act do not impose such a categorical ban.

¶ 34        "The Second Amendment guarantee[s] to 'all Americans' the right to bear commonly used arms in public *subject to certain reasonable, well-defined restrictions*." (Emphasis added.) *Id.* at ___, 142 S. Ct. at 2156 (quoting *Heller*, 554 U.S. at 581). While we agree that the plain text of the second amendment protects the public carriage of firearms for self-defense, we cannot adhere to plaintiffs' argument that the criminal statutes at issue represent a categorical and unconstitutional ban on that right. Under section 24-1(a)(10) of the UUW statute and section 24-1.6(a) of the AUUW statute, individuals who are licensed under the Concealed Carry Act are allowed to exercise their second amendment right to bear arms in public, subject to reasonable regulations. Applying the text-and-history test recently announced in *Bruen*, we find the challenged criminal statutes constitutional, based on this Nation's historical tradition of regulatory measures restricting the manner of public carry.

¶ 35                                    C. Practical Implications

---

[5]The majority of states to address regulations criminalizing the manner of carriage upheld such statutes and constitutional provisions, concluding, almost uniformly, that the right to keep and bear arms was not unlimited and could be regulated. See generally *Andrews*, 50 Tenn. 165; *Aymette v. State*, 21 Tenn. 154 (1840); *Wilson v. State*, 33 Ark. 557 (1878); *Haile v. State*, 38 Ark. 564 (1882); *State v. Reid*, 1 Ala. 612 (1840); *State v. Wilforth*, 74 Mo. 528 (1881); *Mitchell*, 3 Blackf. 229.

¶ 36    Legitimate restrictions have been imposed on each constitutional amendment in the interest of creating reasonable safeguards. No constitutional right is absolute. Even in the context of the first amendment, an individual cannot yell "fire" in a crowded theater. See *Schenck v. United States*, 249 U.S. 47, 52 (1919). The right of free speech is regulated for the safety and well-being of the general public, as are other constitutional rights. As the court in *People v. Rodriguez*, 171 N.Y.S.3d 802, 805-06 (Sup. Ct. 2022), noted:

> "Americans are well acquainted with the truism that one cannot falsely shout fire in a crowded theatre despite the free speech protections of the First Amendment (see *Schenck v. United States*, 249 U.S. 47, 52 [citation] (1919); U.S. Const., amend. I). The Free Exercise Clause does not bar states from requiring that students in public schools be immunized against various vaccine-preventable illnesses over religious objection (see *Prince v. Massachusetts*, 321 U.S. 158, 166-167, 64 S. Ct. 438, 88 L. Ed. 645 (1944); *Phillips v. City of New York*, 775 F.3d 538 (2d Cir. 2015); U.S. Const., amend. I), or from penalizing the use of hallucinogenic drugs, even though ingested pursuant to religious ceremony (see *Employment Div., Dept. of Human Resources of Ore. v. Smith*, 494 U.S. 872, 110 S. Ct. 1595, 108 L. Ed. 2d 876 (1990); see also *Reynolds v. United States*, 98 U.S. 145, 25 L. Ed. 244 (1878) (rejecting claim that criminal laws against polygamy could not constitutionally be applied to those whose religion commanded the practice)). Freedom of the press does not in all cases forbid a prior restraint on publication (see *Nebraska Press Assn. v. Stuart*, 427 U.S. 539, 570, 96 S. Ct. 2791, 49 L. Ed. 2d 683 (1976) ("This Court has frequently denied that First Amendment rights are absolute"); U.S. Const., amend. I). The right of an accused to confront witnesses does not

17

categorically prohibit a child witness in a child sexual abuse trial from testifying by one-way closed circuit television (see *Maryland v. Craig*, 497 U.S. 836, 110 S. Ct. 3157, 111 L. Ed. 2d 666 (1990); U.S. Const., amend. VI). The Fourth Amendment requirement that a warrant be obtained in order to enter a private residence to effect a search or seizure permits exceptions for exigent circumstances (see *Payton v. New York*, 445 U.S. 573, 100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980); U.S .Const., amend. IV)."

¶ 37    We appreciate that *Bruen* fundamentally changed our analysis of laws that implicate the second amendment. The Court rejected the "means-end" test or any form of interest balancing that lower courts typically applied post-*Heller*. Compare *Bruen*, 597 U.S. at ___, 142 S. Ct. at 2126 ("we decline to adopt [the] two-part approach"), with *People v. Chairez*, 2018 IL 121417, ¶¶ 32, 35 (applying a "heightened level" of intermediate scrutiny), and *Horsley v. Trame*, 808 F.3d 1126, 1131 (7th Cir. 2015) (same). But, in doing so, it did not abandon the long-standing principle that the right to bear arms is not unfettered. See *Bruen*, 597 U.S. at ___, 142 S. Ct. at 2130, 2133 (noting by analogy our nation's "historical tradition of firearm regulation"); *id.* at ___ n.9, 142 S. Ct. at 2138 n.9 ("To be clear, nothing in our analysis should be interpreted to suggest the unconstitutionality of the 43 States' 'shall-issue' licensing regimes, under which 'a general desire for self-defense is sufficient to obtain a [permit].' [Citation.]"); *id.* at ___, 142 S. Ct. at 2161 (Kavanaugh, J., concurring, joined by Roberts, C.J.) ("[T]he Court's decision does not prohibit States from imposing licensing requirements for carrying a handgun for self-defense."). Contrary to plaintiffs' contention, *Bruen* did not hold that states are powerless to criminalize the unlicensed possession of firearms within their jurisdictions. In reviewing plaintiffs' constitutional challenge under *Bruen*'s two-part inquiry, considering historical

18

analogies of firearm regulations from 1791 to the Reconstruction Period, we find no support for extending *Bruen*'s holding that far.

¶ 38    To be clear, plaintiffs in this case are requesting to carry firearms in public whenever and *however* they please, a proposition that *Heller*, which is still good law, specifically rejected. See *Heller*, 554 U.S. at 626 (right of citizens to carry arms is "not a right to keep and carry any weapon whatsoever in any manner whatsoever"). They are not challenging the right to carry in specific places, nor are they challenging the licensure process of the Concealed Carry Act. Indeed, they cannot. Eichelberger and other members of Sinnissippi Rod and Gun Club are, in fact, licensed to carry handguns in public under the Concealed Carry Act. Instead, plaintiffs are claiming they have a constitutional right to openly carry a loaded weapon in public whenever and wherever they choose and that the UUW and AUUW statutes criminalizing such conduct are unconstitutional. Plaintiffs' claims are unsupported by *Bruen*.

¶ 39    Analyzing plaintiffs' challenge under *Bruen*, we hold that the UUW and the AUUW statutes, criminalizing the carriage of firearms in violation of Illinois's concealed carry licensing system, are consistent with American historical tradition and do not violate the second amendment.[6]

¶ 40                        IV. CONCLUSION

¶ 41    The judgment of the circuit court of Whiteside County is affirmed.

¶ 42    Affirmed.

¶ 43    JUSTICE ALBRECHT, specially concurring:

---

[6]This holding is consistent with the First District's recent decision in *People v. Thompson*, 2023 IL App (1st) 220429-U, ¶¶ 51-60. There, the court held that Illinois's prohibition of the open carriage of firearms as contained in the AUUW statute (720 ILCS 5/24-1.6 (West 2018)) does not violate the second amendment. *Thompson*, 2023 IL App (1st) 220429-U, ¶¶51-60.

¶ 44    I agree that the State's regulation of open carriage is consistent with the nation's historical tradition of regulating the manner in which an individual may publicly carry a firearm. Therefore, I concur that its prohibition within Illinois's concealed carry licensing regime satisfies the second prong of the *Bruen* inquiry. This holding is also consistent with the recent First District decision, *People v. Thompson*, 2023 IL App (1st) 220429-U, ¶¶ 51, 60. I write separately to point out that, as a threshold issue, plaintiffs' appeal fails because the definition of the right to "bear arms," as adopted in *Heller* and *Bruen*, does not presumptively protect a specific manner in which an individual is entitled to exercise his or her right of public carriage.

¶ 45    As the majority points out, the United States Supreme Court has adopted a natural meaning of the phrase to "bear arms," which denotes the right to " ' "wear, bear, or carry ... upon the person or in the clothing or in a pocket, for the purpose ... of being armed and ready for offensive or defensive action in a case of conflict with another person." ' " *Heller*, 554 U.S. at 584 (quoting *Muscarello v. United States*, 524 U.S. 125, 143 (1998) (Ginsberg, J., dissenting, joined by Scalia, C.J., and Souter, J.), quoting Black's Law Dictionary 214 (6th ed. 1990)). Utilizing this definition, the *Bruen* Court held that the term "bear" naturally encompasses public carry and the second amendment's plain text presumptively covers the conduct of " 'bear[ing]' arms in public for self-defense." See *Bruen*, 597 U.S. at ___, 142 S. Ct. at 2134-35. This does not mean, however, as the plaintiffs suggest, that *any manner* of public carry is protected by the plain language of the second amendment.

¶ 46    The Court's adopted definition of "bear arms" reads disjunctively in defining the right. That is, an individual's right to "bear arms" may be exercised through the wearing, bearing, or carrying of a firearm either openly upon his or her person or concealed inside one's clothes or pocket. See *id.* at ___, 142 S. Ct. at 2134. Nothing in this understanding suggests that an

20

individual is entitled, based on the definition of "bear[ing] arms," to publicly carry openly and concealed. Both textually and historically, therefore, regulating one manner of public carriage while permitting another does not strip an individual of this constitutional guarantee. The Concealed Carry Act is in accordance with this principle.[7]

¶ 47 The initial step in the *Bruen* inquiry requires a determination of whether the plaintiffs' proposed course of conduct falls under the plain text of the second amendment. *Id.* at ___, 142 S. Ct. at 2134. The conduct here is not whether open carry as a form of public carriage is conduct that falls within this ambit. Distinctly, the true nature of the conduct is whether open carry is a protected activity when concealed carry remains available. Based on the disjunctive definition of the right to "bear arms," I would answer this initial step in the negative. Because plaintiffs' conduct falls beyond our judicially accepted understanding of the right to "bear arms," it is not presumptively protected, and I would dismiss plaintiffs' claim at the first step of the *Bruen* inquiry. See *supra* ¶ 13. I find this view closest to the limitations placed upon the second amendment right, which is not a right to "carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller*, 554 U.S. at 626. A contrary holding would expand an individual's right to publicly carry a firearm in any manner that he or she chooses, which frustrates the natural meaning of the second amendment's text.

¶ 48 JUSTICE HOLDRIDGE, dissenting:

¶ 49 The United States Supreme Court has made clear that State restrictions on the public carry of firearms are constitutional *only* if they are consistent with our nation's historical tradition of firearms regulation. Illinois's *categorical ban* on the open carry of firearms finds no

---

  [7]A licensee may carry a fully or partially concealed firearm in public. 430 ILCS 66/10(c)(1) (West 2020); *supra* ¶ 4.

support in historical tradition. Indeed, it runs *directly contrary* to the relevant historical precedents, which unequivocally hold that open carry is an indispensable and uniquely effective means of exercising the second amendment right to armed self-defense in public. As such, open carry may not be categorically banned, even when concealed carry is permitted.

¶ 50        The second amendment secures an individual's right to keep and bear arms for self-defense. *Heller*, 554 U.S. at 595. This includes the right to carry commonly used firearms in public, subject to "reasonable, well-defined" government restrictions. *Bruen*, 597 U.S. at ___, 142 S. Ct. at 2156. These rights apply to the states through the fourteenth amendment. See *McDonald v. City of Chicago*, 561 U.S. 742, 750 (2010).

¶ 51        When the second amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. *Bruen*, 597 U.S. at ___, 142 S. Ct. at 2126. To justify its regulation of such conduct, the government may not simply posit that the regulation promotes an important interest. *Id.* at ___, 142 S. Ct. at 2126. Rather, the government must demonstrate that the regulation is consistent with this nation's historical tradition of firearm regulation. *Id.* at ___, 142 S. Ct. at 2126; *Caulkins v. Pritzker*, 2023 IL 129453, ¶ 43. Only if a firearm regulation is consistent with this nation's historical tradition may a court conclude that the individual's conduct falls outside the second amendment's "unqualified command." (Internal quotation marks omitted.) *Bruen*, 597 U.S. at ___, 142 S. Ct. at 2126.

¶ 52        The *only* questions in this case are (1) whether the plain text of the second amendment encompasses the *open carry* of firearms in public and (2) if so, whether Illinois's categorical ban on open carry is consistent with our nation's historical tradition of firearm regulation. I find that the plain text of the second amendment encompasses the right to the open public carry of firearms and that Illinois's categorical ban is unconstitutional.

22

¶ 54    The text of the second amendment protects the conduct at issue in this case, *i.e.*, the open carry of firearms in public. The majority does not address this issue because it finds it unnecessary to the resolution of the case. However, the special concurrence adopts the State's argument that the second amendment's plain text does not encompass the plaintiffs' conduct. I disagree.

¶ 55    In *Bruen*, the United States Supreme Court held that, by its plain terms, the right to "bear" arms expressed in the second amendment includes the right to carry commonly used firearms in public for self-defense. *Bruen*, 597 U.S. at ___, 142 S. Ct. at 2135. Open carry is simply *one manner* of public carry. Accordingly, the second amendment's plain text presumptively protects the conduct at issue in this case, open carry. *Id.* Therefore, the only question is whether a categorical ban on one manner of public carry (open carry) is consistent with this nation's historical tradition of gun regulations.

¶ 56    The State argues that the open carry of firearms is not presumptively protected because the text of the second amendment "says nothing about the right to bear arms in a particular manner, such as openly." As noted above, however, the open carry of firearms is a type of public carry, which, in turn, is presumptively protected by the second amendment's text. Because public carry is presumptively protected as a general matter, *all types of public carry* fall within the ambit of such protection. The sole question is whether a particular restriction on a particular manner of public carry is constitutionally permissible.

¶ 57    Further, if the Supreme Court had understood the second amendment as protecting only *concealed* carry, it would not have held that the amendment guarantees the right to wear, bear, or carry "upon the person" *or* "in the clothing or in a pocket." (Internal quotation marks omitted.)

See *id.* at \_\_\_, 142 S. Ct. at 2134. The Court's use of the word "or" conveys that there is a difference between carrying a firearm "upon the person" and carrying it "in the clothing or in a pocket," and that *both* methods of carry are constitutionally protected.

¶ 58        The special concurrence reads the Supreme Court's use of the disjunctive "or" to mean that the second amendment protects *either* open *or* concealed carry, but not both at the same time. This interpretation contravenes the plain meaning of the language at issue. The Supreme Court merely references two different types of carry that are constitutionally protected.

¶ 59        The Supreme Court neither states nor implies anything about the availability of one method when the other method is prohibited. The most natural reading of the Supreme Court's use of "or" is that it identifies two distinct methods of carrying firearms, both of which are presumptively protected. Whether one method may be banned when another method is prohibited is a *separate question* that must be resolved by determining whether such a restriction is consistent with our nation's history of firearm regulation.

¶ 60        To justify the special concurrence's conclusion that the text of the second amendment does not cover the conduct at issue in this case, the special concurrence also adopts an awkward and unduly narrow construction of the term "conduct." Rather than defining the conduct at issue as "the open carry of firearms in public" (which would be the simplest and most straightforward definition), the special concurrence contends that "the true nature of the conduct is whether open carry is a protected activity *when concealed carry remains available.*" (Emphasis added.) *Supra* ¶ 47.

¶ 61        By defining the "conduct" in reference to the regulatory regime at issue, the special concurrence puts the cart before the horse by presuming the constitutionality of Illinois's regulatory scheme during the first phase of the *Bruen* analysis. However, during the first phase,

24

we must determine *only* whether the text of the amendment covers the general type of conduct at issue. If we find that it does, we then proceed to the second phase to determine whether the regulation at issue is constitutionally permissible.

¶ 62    The Supreme Court has ruled unequivocally that public carry for self-defense is protected. *Bruen*, 597 U.S. at ___, 142 S. Ct. at 2135. Open carry is one species of public carry, so it is presumptively covered. The question then becomes whether the particular restriction on public carry imposed by Illinois (a categorical ban on open carry while allowing for concealed carry) is consistent with our nation's historical tradition of firearm regulation.

¶ 63    The Supreme Court applied this method of analysis in *Bruen*, and we are bound to follow it. In *Bruen*, the Court did not ask whether the right to public carry *as regulated by New York's licensing scheme* was covered by the text of the second amendment. Instead, it asked whether public carry in general was protected. After holding that it was covered, the Court proceeded to the second phase of the analysis. Only then did it seek to determine whether New York's particular licensing regime was constitutional. The special concurrence jumps the gun (no pun intended) by presuming the constitutionality of Illinois's regulatory regime before applying the required historical analysis.

¶ 64    The remainder of the special concurrence's argument is premised largely on the proposition that any particular manner of carry is subject to reasonable regulation. I agree. I am not contending that open carry is an absolute and inviolable right that may not be restricted under any circumstances. However, I find that the categorical ban imposed by Illinois *is not* a "reasonable regulation" permitted under the second amendment because it is not consistent with our nation's historical regulation of firearms. The special concurrence's suggestion that any

25

challenge to Illinois's statutory scheme amounts to a denial of the legitimacy of *any* regulation on open carry is a straw man argument.

¶ 65 The State and the majority further contend that, in *Bruen*, the Supreme Court upheld the constitutionality of "shall-issue" licensing regimes like Illinois's which limit the discretion of State and local governments to deny public carry licenses to law-abiding citizens. In support of this argument, they point to *Bruen*'s statement that "nothing in our analysis should be interpreted to suggest the unconstitutionality of the 43 States' 'shall-issue' licensing regimes, under which 'a general desire for self-defense is sufficient to obtain a [permit].' [Citation.]" *Id.* at ___ n.9, 142 S. Ct. at 2138 n.9. When read in its proper context, this statement does not support the State's and the majority's argument. In the statement at issue, the *Bruen* Court merely noted that, although it found New York's "may-issue" law to be unconstitutional, *it was not addressing* the constitutionality of any particular "shall-issue" regime. Its holding did not determine whether any such regimes were unconstitutional. *Bruen* did not hold that all "shall-issue" licensing regimes are constitutional *per se*. To the contrary, it held that a categorical ban on public carry was unconstitutional, and it did not limit that holding to "may-issue" regimes.

¶ 66 The State maintains that the plaintiffs have forfeited their arguments in this case because they have "made no effort to satisfy their burden of showing that the second amendment's text covers the open carriage of firearms" and have not "engaged with" *Bruen*'s historical analysis. Although the plaintiffs' arguments could have been developed more extensively, I do not find their arguments so skeletal and perfunctory as to be forfeited. Regardless, forfeiture is a limitation on the parties, not on courts. *People v. Sophanavong*, 2020 IL 124337, ¶ 21. Given the importance of the constitutional issue presented in this case, the merits of the case should be addressed notwithstanding any claim of forfeiture.

## II. The Historical Tradition of Firearm Regulation

Because the right to carry firearms in public is presumptively protected by the second amendment, the only remaining question is whether the State of Illinois's allowing for the *concealed* carry of firearms in public while categorically banning the *open* carry of such weapons is consistent with our nation's historical tradition of firearm regulation. The State bears the burden to prove that it is. *Bruen*, 597 U.S. at ___, 142 S. Ct. at 2135. Only if the State can successfully carry that burden may it credibly maintain that the second amendment does not protect the open carry of firearms. *Id.* at ___, 142 S. Ct. at 2135. I find it cannot.

In determining whether the State's categorical ban of open carry is consistent with the nation's traditional firearm regulations, it is necessary to consider the regulation of firearms during various historical periods, including (1) medieval to early modern England, (2) the American Colonies and the early Republic, (3) antebellum America, (4) Reconstruction, and (5) the late-nineteenth and early-twentieth centuries. *Id.* at ___, 142 S. Ct. at 2135-36.

However, "when it comes to interpreting the Constitution, not all history is created equal." *Id.* at ___, 142 S. Ct. at 2136. " 'Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them ***.*' " (Emphasis in original.) *Id.* at ___, 142 S. Ct. at 2136 (quoting *Heller*, 554 U.S. at 634-35).

The second amendment was adopted in 1791; the fourteenth in 1868. "Historical evidence that long predates either date may not illuminate the scope of the right if linguistic or legal conventions changed in the intervening years." *Id.* at ___, 142 S. Ct. at 2136. The most relevant and probative historical evidence is that which illuminates the public understanding of the right to bear arms that "prevailed up to the period immediately before and after the framing of the Constitution." (Internal quotation marks omitted.) *Id.* at ___, 142 S. Ct. at 2136. Evidence

from the antebellum period is particularly "critical" because (1) it is relatively near the time of the founding and closely predates the ratification of the fourteenth amendment in 1868, and (2) "the public understanding of the right to keep and bear arms in both 1791 and 1868 was, for all relevant purposes, the same with respect to public carry." *Id.* at ___, 142 S. Ct. at 2138. The majority acknowledges this. See *supra* ¶ 25 (noting that, in determining whether a modern regulation on the public carry of firearms is constitutional, the most important inquiry is whether the regulation comports with "the scope of the second amendment when it was adopted in 1791 through the ratification of the fourteenth amendment in 1868 and the Reconstruction Period").

¶ 72       Prior to the antebellum period, no State statutes, published judicial decisions, or legal commentators addressed whether States may ban the *open* carry of ordinary firearms for self-defense while allowing the *concealed* carry of such firearms. The State points to various general bans on the public carry of firearms imposed in England from enactment of the Statute of Northampton in 1328 (Statute of Northampton 1328, 2 Edw. 3, c. 3 (Eng.)) through the enactment of the English Bill of Rights in 1689. This historical evidence is of little relevance to the question presented in this case.

¶ 73       None of the regulations at issue banned the open carry of firearms while allowing concealed carry. Moreover, as the Supreme Court held in *Bruen*, the majority of these regulations did not *categorically* ban the open carry of all firearms in public, as Illinois has done. Rather, they banned only certain limited and well-defined methods of open carry, such as the open carry of "unusual" weapons, the carry of weapons in certain "sensitive" places, or the bearing of weapons with the *intent* to terrify members of the public. See *Bruen*, 597 U.S. at ___, 142 S. Ct. at 2138-42. The historical sources upon which the State relies confirm this. See Abraham Fraunce, The Lawiers Logike: Exemplifying the Praecepts of Logike by the Practice of

the Common Lawe 56 (London, William Howe 1588); 4 William Blackstone, Commentaries on the Laws of England 148-49 (1769). In *Sir John Knight's Case* (1686) 87 Eng. Rep. 75, 76 (KB), Chief Justice Herbert explained that the English common law tradition, which was codified in the Statute of Northampton, established that a person going armed in public would violate the Statute *only* when he acted with malice or evil intent.

¶ 74     Nonetheless, to the extent that any centuries-old English statute or common law prohibited or broadly restricted the public carry of firearms, including open carry, such antiquated legal sources are of minimal relevance unless similar regulations were in place shortly before or after the ratification of the Bill of Rights in 1791. See *Bruen*, 597 U.S. at ___, 142 S. Ct. at 2136 (ruling that "English common-law practices and understandings at any given time in history cannot be indiscriminately attributed to the Framers of our own Constitution," and that, in interpreting our own Constitution, "it [is] [sometimes] better not to go too far back into antiquity for the best securities of our liberties [citation], unless evidence shows that medieval law survived to become our Founders' law").

¶ 75     As the Supreme Court found in *Bruen*, few such regulations existed in the Colonies before or after the ratification of the second amendment. See *id.* at ___, 142 S. Ct. at 2142 ("there is little evidence of an early American practice of regulating public carry by the general public"). The Court added that "[t]his should come as no surprise" because "English subjects founded the Colonies at about the time England had itself begun to eliminate restrictions on the ownership and use of handguns." *Id.* at ___, 142 S. Ct. at 2142.

¶ 76     The State identifies several regulations of public carry that existed during the colonial period or shortly after the ratification of the Bill of Rights. None of these regulations *banned* open public carry categorically. For example, the State points to an East New Jersey statute that

29

was enacted in 1686. That statute prohibited the *concealed* carry of "pocket pistol[s]" or other "unusual or unlawful weapons," and it further prohibited "planter[s]" from carrying all pistols unless in military service or, if "strangers," when traveling through the "Province." An Act Against Wearing Swords, &c., ch. 9, in Grants, Concessions, and Original Constitutions of the Province of New Jersey 290 (2d ed. 1881) (Grants and Concessions). These restrictions do not support the State's argument.

¶ 77    As the Supreme Court noted in *Bruen*, the foregoing statute "restricted only concealed carry, not all public carry, and its restrictions applied only to certain 'unusual or unlawful weapons,' including 'pocket pistol[s].' " *Bruen*, 597 U.S. at ___, 142 S. Ct. at 2143 (quoting Grants and Concessions, *supra*, at 290). Pocket pistols were far smaller than the other belt and hip pistols that were commonly used for lawful purposes in the 1600s and were therefore capable of being concealed. *Id.* at ___, 142 S. Ct. at 2143. Moreover, "the law *** presumably did not by its terms touch [on] the open carry of larger, presumably more common pistols, except as to " 'planters.' " *Id.* at ___, 142 S. Ct. at 2144 (quoting Grants and Concessions, *supra*, at 290). The Court noted that, although the "planter" restriction may have prohibited the public carry of pistols, "it did not prohibit planters from carrying long guns for self-defense—including the popular musket and carbine." *Id.* at ___, 142 S. Ct. at 2144. For all of these reasons, the Court concluded that the statute was not entitled to any "meaningful weight" in determining the scope of the second amendment. *Id.* at ___, 142 S. Ct. at 2144.

¶ 78    The State points to other statutes enacted in colonial Massachusetts and New Hampshire that authorized justices of the peace to arrest "all Affrayers, Rioters, Disturbers, or Breakers of the Peace, and such as shall ride or go armed Offensively ... by Night or by Day, in Fear or Affray of Their Majesties Liege People." 1692 Mass. Acts and Laws no. 6, pp. 11-12; see 1699

30

N.H. Laws ch. 1. In *Bruen*, the Supreme Court found that these statutes "merely codified the existing common-law offense of bearing arms to terrorize the people, as had the Statute of Northampton itself." *Bruen*, 597 U.S. at ___, 142 S. Ct. at 2143. For instance, the Massachusetts statute proscribed " 'go[ing] armed Offensively ... in Fear or Affray' of the people," indicating that these laws were "modeled after the Statute of Northampton to the extent that the statute would have been understood to limit public carry in the late 1600s." (Emphasis omitted.) *Id.* at ___, 142 S. Ct. at 2143 (quoting 1692 Mass. Acts and Laws no. 6, pp. 11-12). In that time period, it was understood that the bearing of firearms openly in public would terrify people *only* if the firearm was unusual or was brandished in an aggressive manner with the intent to terrify. *Id.* at ___, 142 S. Ct. at 2143.

¶ 79    The State points to a number of other pre-ratification statutes that restricted or barred the method and manner of public carry. These statutes generally did not bar public carry or open public carry categorically. After reviewing these statutes, the Supreme Court noted that "[a] by-now-familiar thread runs through [them]: They prohibit bearing arms in a way that spreads 'fear' or 'terror' among the people." *Id.* at ___, 142 S. Ct. at 2145. The Supreme Court noted that "Chief Justice Holt in *Sir John Knight's Case* interpreted this *in Terrorem Populi* element to require something more than merely carrying a firearm in public." *Id.* at ___, 142 S. Ct. at 2145. And there was "no reason to think that the founding generation held a different view." *Id.* at ___, 142 S. Ct. at 2145. Similarly, Serjeant William Hawkins, in his widely read 1716 treatise, confirmed that "no wearing of Arms is within the meaning of [the Statute of Northampton], *unless* it be accompanied with such Circumstances as are apt to terrify the People." (Emphasis added.) 1 William Hawkins, A Treatise of the Pleas of the Crown 136 (1716); *Bruen*, 597 U.S. at ___, 142 S. Ct. at 2142. To illustrate that proposition, Hawkins noted as an example that

31

" 'Persons of Quality' " were " 'in no Danger of Offending against this Statute by wearing common Weapons' " because, in those circumstances, it would be clear that they had no " 'Intention to commit any Act of Violence or Disturbance of the Peace.' " *Id.* at ___, 142 S. Ct. at 2142 (quoting 1 Pleas of the Crown 136); see also Theodore Barlow, The Justice of Peace: A Treatise Containing the Power and Duty of that Magistrate 12 (1745).

¶ 80          It is important to note that, after reviewing the historical evidence, the Supreme Court explicitly held "there is no historical basis for concluding that the preexisting right enshrined in the Second Amendment permitted broad prohibitions on all forms of public carry" in the century leading up to the second amendment and in the first decade after its adoption. *Id.* at ___, 142 S. Ct. at 2145.

¶ 81          Throughout the nineteenth century, numerous States enacted laws banning the *concealed* carry of firearms for self-defense but allowing the *open* carry of such weapons. Several cases decided in the antebellum period explicitly addressed the constitutionality of such laws. These cases are the *only* legal authorities that squarely address the question presented in this case, *i.e.* whether the right to open carry is guaranteed by the second amendment.

¶ 82          The Supreme Court has relied extensively on some of these cases in determining the scope of the second amendment. See *Heller*, 554 U.S. at 605 (ruling that "the examination of a variety of legal and other sources to determine the public understanding of a legal text in the period after its enactment or ratification" is a "critical tool" in "constitutional interpretation," and relying on several of the antebellum cases at issue to ascertain whether the second amendment was understood to confer a private right of self-defense (emphasis omitted)); *Bruen*, 597 U.S. at ___, 142 S. Ct. at 2146-47 (relying upon the same antebellum cases, among other sources, in determining the nation's historical tradition of regulating public carry).

¶ 83    These antebellum decisions almost uniformly hold that States may ban *concealed* carry without running afoul of the second amendment, but they may not ban *open* carry. The overwhelming majority of these cases hold, either expressly or implicitly, that open carry is the only manner of public carry that effectuates the right of self-defense guaranteed by the second amendment and is, therefore, the manner of public carry protected by the second amendment.

¶ 84    In *State v. Chandler*, 5 La. Ann. 489, 489 (1850), the Louisiana Supreme Court upheld a statute that made it a misdemeanor to be "found with a concealed weapon *** concealed in his bosom, coat, or any other place about him, that does not appear in full open view." (Internal quotation marks omitted.) The court found the law to be "absolutely necessary to counteract a vicious state of society, growing out of the habit of carrying concealed weapons, and to prevent bloodshed and assassinations committed upon unsuspecting persons." *Id.* at 489-90. However, the court held that citizens had the right under the second amendment to carry arms *openly*. *Id.* at 490. The court noted that the statute at issue did not interfere with a man's right to "carry arms *** in full and open view, which places men upon an equality." (Internal quotation marks omitted.) *Id.* The court held that "[t]his is the right guaranteed by the Constitution of the United States, and which is calculated to incite men to a manly and noble defence of themselves, if necessary, and of their country, without any tendency to secret advantages and unmanly assassinations." *Id.*

¶ 85    In *Nunn v. State*, 1 Ga. 243 (1846), the Supreme Court of Georgia reached the same conclusion. In that case, the defendant was charged by indictment with a misdemeanor for "having and keeping about his person, and elsewhere, a pistol" that was not a horseman's pistol. (Emphasis and internal quotation marks omitted.) *Id.* at 247. The statute under which he was charged and convicted banned the keeping, carrying, sale, and use of such a weapon and of

33

certain other weapons, under any circumstances. *Id.* The defendant was not charged with carrying the pistol in a concealed manner. The Georgia Supreme Court ruled that the statute violated the second amendment to the extent that it banned open carry, which the court characterized as the "natural right of self-defence." (Emphasis omitted.) *Id.* at 251. Specifically, the court ruled that,

> "so far as [the statute] seeks to suppress the practice of carrying certain weapons *secretly*, that it is valid, inasmuch as it does not deprive the citizen of his *natural* right of self-defence, or of his constitutional right to keep and bear arms. But that so much of it, as contains a prohibition against bearing arms *openly*, is in conflict with the Constitution, and *void* \*\*\*." (Emphases in original.) *Id.*

Accordingly, the court held that, because the defendant "ha[d] been indicted and convicted for carrying a pistol, without charging that it was done in a concealed manner, under that portion of the statute which entirely forbids its use, the judgment of the court below must be reversed, and the proceeding quashed." *Id.* (*Heller* noted with approval the *Nunn* court's interpretation of the scope the second amendment, at least as to *Nunn*'s holding that the second amendment guaranteed an individual the right to bear arms for his own self-defense.)

¶ 86    Similarly, in *State v. Reid*, 1 Ala. 612 (1840), the Supreme Court of Alabama ruled that a ban on concealed weapons was permissible under Alabama's constitutional analogue to the second amendment, but that a ban on open carry would not be. The court concluded that the legislature "cannot inhibit the citizen from bearing arms openly" because the Alabama Constitution "authorizes him to bear them for the purposes of defending himself and the State, and *it is only when carried openly, that they can be efficiently used for defence*." (Emphasis

34

added.) *Id.* at 619. According to the court, a ban on concealed carry did not violate a citizen's constitutional right to keep and bear arms for self-defense because, for purposes of self-protection in moments of immediate danger, "there can be no necessity for concealing the weapon." *Id.* at 621. The court stated that it could not conceive of "any supposable circumstances" under which concealed carry would be "indispensable to the right of defence." *Id.* at 622.

¶ 87    The Tennessee Supreme Court reached a similar conclusion in *Aymette v. State*, 21 Tenn. 154 (1840). In that case, the court upheld the state's concealed weapons ban. *Id.* at 161-62. Finding that "the right to bear arms in defence of themselves is coupled with the right to bear them in defence of the State," and that arms used in defense of the State "must necessarily be borne openly," the court held that only the open carry of weapons could be protected by Tennessee's second amendment analogue. *Id.* at 161. A categorical ban on open carry would infringe upon the right to bear arms. *Id.* at 159-60. Further, in Kentucky, *Bliss v. Commonwealth*, 12 Ky. 90 (1822), held that *any* ban on the public carry of firearms for self-defense, whether open or concealed, violated Kentucky's state constitutional analogue to the second amendment.

¶ 88    These cases firmly establish that, by the time of the antebellum period, the right to open carry was considered an essential corollary of the right to bear arms in self-defense guaranteed by the second amendment (or by its state-law analogues). According to that understanding, open carry, and *only* open carry, effectuates the constitutional right to armed self-defense, and it does so in a way that avoids the threats to public safety posed by the concealed carry of weapons.

¶ 89    Put simply, according to the antebellum cases, the constitutional right to bear commonly used arms in public for self-defense *is* the right to bear such arms *openly*. Concealed carry was disfavored and deemed to be outside of the scope of constitutional protections. Thus, the

antebellum courts held that, while a State may lawfully ban concealed carry under the second amendment, it may not ban open carry. The antebellum cases are the only legal authorities to squarely address these issues either before the enactment of the second amendment or during the 70 years following its ratification. Accordingly, they are the only sources that establish the public understanding of the second amendment during the most relevant historical periods, *i.e.*, the period shortly after its ratification and shortly before the ratification of the fourteenth amendment. See generally *Heller*, 554 U.S. at 605.

¶ 90        Adopting the State's argument, the majority maintains that Illinois's ban on open carry is consistent with these antebellum cases and with the numerous state statutes enacted in the 19th century that banned concealed carry while allowing open carry. The majority notes, correctly, that States have always had the authority to regulate the *manner* of public carry and that many States exercised that right during the nineteenth century by prohibiting one type of carry while permitting another. The majority and the State contend that, because the Illinois laws at issue also prohibit one type of carry while allowing another, the Illinois regulations are equivalent to the nineteenth century regulations and are therefore constitutionally permissible.

¶ 91        However, *all* of nineteenth century statutes and cases that distinguish between open carry and concealed carry allow open carry but ban concealed carry.

¶ 92        Illinois, however, has taken precisely the opposite approach by permitting concealed carry but prohibiting open carry. This radical departure from historical precedent is not constitutionally permissible. Even assuming *arguendo* that a categorical ban on *concealed* carry is constitutional (as historical precedents have found), that does not mean that a categorical ban on *open* carry passes constitutional muster.

36

¶ 93        In fact, the antebellum cases discussed above rule out that possibility. The vast majority

of the antebellum cases that have address the issue either held or implied that the right to armed

self-defense enshrined in the second amendment could be effectively exercised *only* through

open carry. Concealed carry was disfavored because it was considered to be more dangerous

than open carry and a less effective means of self-defense. It was therefore considered to be

outside the scope of the second amendment's protections. The traditional approach of banning

concealed carry, while allowing open carry, was not merely a random or fungible policy choice.

It was based on a public understanding of the meaning and scope of the second amendment that

precludes a categorical prohibition of open carry.

¶ 94        The State's and the majority's argument presumes that open and concealed carry are an

interchangeable and equally effective manner of exercising the second amendment's right to

armed self-defense, such that either manner may be prohibited without any diminishment of that

right. In other words, according to the State and the majority, open carry and concealed carry are

functionally identical. Either manner, standing alone, would adequately protect the second

amendment right. Accordingly, it does not matter which manner is allowed and which is barred,

so long as one method remains available.

¶ 95        However, as noted above, the majority of authorities to address this issue reject the

State's argument. They hold that open carry and concealed carry are categorically different and

that *only* open carry effectuates the right to armed self-defense guaranteed by the second

amendment. See *Chandler*, 5 La. Ann. at 490; *Nunn*, 1 Ga. at 251; *Reid*, 1 Ala. at 619; *Aymette*,

21 Tenn. at 161; see also Eugene Volokh, *Implementing the Right to Keep and Bear Arms for

Self-Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L. Rev. 1443, 1516

(2009) ("*Heller* stated that bans on concealed carry of firearms are so traditionally recognized

that they must be seen as constitutionally permissible. *** The same cannot, however, be said about general bans on carrying firearms in public, which prohibit open as well as concealed carrying."); Jonathan Meltzer, *Open Carry for All: Heller and Our Nineteenth-Century Second Amendment*, 123 Yale L.J. 1486, 1527-28 (2014) ("[T]he distinction between open and concealed carry was crucial to [the 19th century courts'] understanding of what proper self-defense entailed. For them," "[s]elf-defense inherently required the open carry of weapons, because someone who concealed a weapon must surely have some sort of aggressive or sneaky intent.").

¶ 96     All of the statutes and cases cited by the majority and by the State involve either the categorical prohibition of public carry in general or the barring of concealed carry while allowing open carry. Neither the State nor the majority have identified a *single* regulation in the nation's historical tradition of firearm regulation prior to or during the antebellum period prohibiting open carry but permitting concealed carry. Any such regulations were enacted long after the ratification of the Bill of Rights and of the fourteenth amendment and are therefore not probative of the public understanding of the second amendment during the relevant time periods.

¶ 97     Moreover, to the extent that any categorical bans on all forms of public carry (including open carry) existed during the relevant historical periods, our Supreme Court held in *Bruen* that such restrictions were rare and ran contrary to the nation's historical tradition of firearms regulation. As the majority concedes, *Bruen* held that such categorical bans on public carry are unconstitutional. Therefore, the statutes and cases cited by the majority enacting or upholding such bans may not be relied upon to demonstrate our nation's historical tradition of "reasonable regulations" of the manner of carrying firearms.

38

¶ 98     The majority asserts that the antebellum cases support its argument. This assertion is based on a misreading of the facts and holdings of these cases. I will quote the relevant passage of the majority opinion in full. The majority states that

> "a review of the cases considering th[e] laws [proscribing concealed carry] demonstrates that *allowing open carry* while *prohibiting concealed carry* was not the crucial factor in determining whether the restrictions passed constitutional muster. In the vast majority of those cases, courts struck down statutes that categorically prohibited the public carriage of firearms, both open and concealed, and ruled that the second amendment permitted limited restriction but not a complete ban. Courts concluded that the government could lawfully eliminate one kind of public carry to protect and ensure the safety of its citizens, so long as the people were permitted to carry weapons in another manner that allowed self-defense. The constitutional emphasis in those cases was the nature of the restriction— categorical (unconstitutional) versus limited (constitutional)—rather than open versus concealed." (Emphases in original.) *Supra* ¶ 30.

In support of its argument, the majority cites 15 cases that were decided after the second amendment was ratified and before the ratification of the fourteenth amendment. *Only one* of these cases addressed a categorical ban on the public carry of firearms or other weapons. See *Nunn*, 1 Ga. at 251. Thirteen of the remaining cases upheld a total or partial ban on *concealed* carry *where open carry was permitted*. See *Chandler*, 5 La. Ann. at 489-90; *Reid*, 1 Ala. at 621; *State v. Smith*, 11 La. Ann. 633, 634 (1856); *State v. Buzzard*, 4 Ark. 18, 24-25, 27 (1842); *State v. Mitchell*, 3 Blackf. 229 (Ind. 1833); *State v. Jumel*, 13 La. Ann. 399 (1858); *Aymette*, 21 Tenn.

39

at 159-61; *State v. Click*, 2 Ala. 26 (1841); *Commonwealth v. McClanahan*, 59 Ky. 8 (1859); *State v. Stanford*, 20 Ark. 145 (1859); *Jackson v. State*, 12 Ga. 1 (1852); *Haile v. State*, 38 Ark. 564 (1882); *State v. Wilforth*, 74 Mo. 528 (1881); *Wilson v. State*, 33 Ark. 557 (1878). In several of these cases, the courts explicitly held that such a ban was constitutional *because open carry was the manner of carry that exercised the constitutional right to bear arms* guaranteed by the federal constitution or its State-law analogues. See, *e.g.*, *Chandler*, 5 La. Ann. at 490 (holding that Louisiana's prohibition of concealed carry did not interfere with a man's right to "carry arms *** in full and open view," which "is the right guaranteed by the Constitution of the United States, and which is calculated to incite men to a manly and noble defence of themselves, if necessary, and of their country, without any tendency to secret advantages and unmanly assassinations" (internal quotation marks omitted)); *Reid*, 1 Ala. at 619 (holding that the legislature "cannot inhibit the citizen from bearing arms openly" because the Alabama constitution "authorizes him to bear them for the purposes of defending himself and the State, and it is only when carried openly, that they can be efficiently used for defence"); *Aymette*, 21 Tenn. at 159-61 (upholding the State's concealed weapons ban and ruling that the citizens "right to bear arms in defence of themselves is coupled with the right to bear them in defence of the State," and that arms used in defense of the State "must necessarily be borne openly"). In *Walls v. State*, 7 Blackf. 572 (Ind. 1845), the court did not address concealed carry but ruled that a ban on open carry was unconstitutional.

¶ 99        Although *Nunn* addressed a categorical ban on public carry, it definitively rejects the majority's argument that one method of carry (either open or concealed) may be banned so long as the other method remains available. The statute at issue in *Nunn* categorically banned the public carry of a pistol in *any* manner. The Georgia Supreme Court ruled that the statute at issue

40

violated the second amendment *only to the extent that it banned open carry*, which the court characterized as the "natural right of self-defence." (Emphasis omitted.) *Nunn*, 1 Ga. at 251.

¶ 100　　　The *Nunn* court could have found that the statute was unconstitutional because it categorically banned *both* methods of public carry and that the statute would have been constitutional if *either* open carry *or* concealed carry were permitted. It did not. Instead, the court held that

> "so far as [the statute] seeks to suppress the practice of carrying certain weapons *secretly*, that it is valid, inasmuch as it does not deprive the citizen of his *natural* right of self-defence, or of his constitutional right to keep and bear arms. But that so much of it, as contains a prohibition against bearing arms *openly*, is in conflict with the Constitution, and *void ***".*" (Emphases in original.) *Id.*

*Nunn*, therefore, flatly rejects the majority's theory that open and concealed carry are equivalent and that either may be banned so long as the other remains available. Contrary to the majority's argument, *Nunn* unequivocally concludes that, while concealed carry may be barred, the second amendment requires that open carry be available.

¶ 101　　　Nor is there support for the majority's and the State's theory in *Bruen*. The State cites *Bruen* for the proposition that states were able to "lawfully eliminate one kind of public carry *** so long as they left open the [other] option." *Bruen*, 597 U.S. at ___, 142 S. Ct. at 2150. However, the text that the State omits by ellipsis and through brackets conveys *exactly the opposite* meaning! Read in its entirety, the actual quote states that the historical evidence from the antebellum period shows that "States could lawfully eliminate one kind of public carry—*concealed carry*—so long as they left open *the option to carry openly*." (Emphases added.) *Id.* at ___, 142 S. Ct. at 2150.

41

¶ 102    The State's egregious misrepresentation of the quote is disingenuous and disturbing. I remind counsel for the State of their ethical duty of candor to this court under the Illinois Rules of Professional Conduct of 2010. See Ill. R. Prof'l Conduct (2010) R. 3.3(a) (eff. Jan. 1, 2010).

¶ 103    The majority's contention that *Bruen* supports its position is also unavailing. The passages in *Bruen* cited by the majority merely indicate that the manner of public carry is subject to reasonable regulation. They neither state nor imply that open carry is functionally equivalent to concealed carry, such that the former may be categorically banned so long as the latter remains available. In fact, as noted above, the Court in *Bruen* read the antebellum cases as holding that states may lawfully eliminate *concealed* carry so long as *open* carry is permitted.

¶ 104    In addition, contrary to the majority's claim, *Bruen* does not hold that a statute passes constitutional muster "[a]s long as the regulation does not compel 'an absolute ban' that imposes a significant burden on the right of self-defense." *Supra* ¶ 33. Although *Bruen* approved of *Heller*'s reversal of a total ban on the possession of commonly used weapons (*Bruen*, 597 U.S. at ___, 142 S. Ct. at 2128), neither *Heller* nor *Bruen* suggests that regulations on public carry are constitutional unless they proscribe public carry altogether. As *Bruen* makes abundantly clear, regulations are constitutional only if they are "reasonable," *i.e.*, only when they are consistent with our nation's historical tradition of gun regulation. Regulations that stop short of a total ban on public carry may still run afoul of the second amendment under this standard. Even the extremely restrictive regulations that the Supreme Court found to be unconstitutional in *Bruen* did not ban public carry categorically.

¶ 105    In the alternative, the State and the majority maintain that Illinois's licensing system for public carry is analogous to the historical regulations approved in *Bruen* and is therefore constitutionally permissible. To determine whether a modern regulation is consistent with our

42

nation's historical tradition of firearm regulation, courts must sometimes reason by analogy. See *id.* at ___, 142 S. Ct. at 2132. Such reasoning is often required in "cases implicating unprecedented societal concerns or dramatic technological changes." *Id.* at ___, 142 S. Ct. at 2132. For example, a court may be required to determine whether a modern communication over the Internet is a constitutionally protected communication under the first amendment, whether the use of a tracking device or a thermal imaging device is a permissible "search" within the meaning of the fourth amendment, or whether the banning of modern weapons that did not exist at the time the second amendment was ratified is constitutional. See, *e.g.*, *id.* at ___, 142 S. Ct. at 2132; *Heller*, 554 U.S. at 582; *United States v. Jones*, 565 U.S. 400, 404-05 (2012); *Kyllo v. United States*, 533 U.S. 27 (2001).

¶ 106    Such analogical reasoning is neither necessary nor appropriate in this case because the issues presented here involve the scope of the right to publicly carry arms in general and the extent to which public carry may be restricted under the second amendment. These are fundamental questions that were familiar and were repeatedly addressed by courts and legislatures before, during, and after the framing. This case does not require the application of a historical constitutional rule to a new situation or to modern technologies that did not exist at the time the Bill of Rights was ratified in 1791. Accordingly, like the issues presented in *Bruen* and *Heller*, the issue presented in this case requires only a "straightforward historical inquiry." *Bruen*, 597 U.S. at ___, 142 S. Ct. at 2131.

¶ 107    However, even assuming *arguendo* that analogical reasoning is necessary, such reasoning does not support the State's and the majority's argument. Ascertaining whether a historical regulation is a proper analogue for a modern firearm regulation requires a determination of whether the two regulations are "relevantly similar." *Id.* at ___, 142 S. Ct. at 2132. This involves

43

an inquiry into "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* at ___, 142 S. Ct. at 2133; see *McDonald*, 561 U.S. at 767; *Heller*, 554 U.S. at 599. Courts should not "uphold every modern law that remotely resembles a historical analogue," because doing so "risk[s] endorsing outliers that our ancestors would never have accepted." (Internal quotation marks omitted.) Bruen, 597 U.S. at ___, 142 S. Ct. at 2133. On the other hand, "analogical reasoning requires only that the government identify a well-established and representative historical analogue, not a historical twin." (Emphases omitted.) *Id.* at ___, 142 S. Ct. at 2133. "So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.* at ___, 142 S. Ct. at 2133.

¶ 108    The State and the majority contend that, under these standards, the Illinois regulations at issue are analogous to historical regulations. They argue that both the Illinois laws and the traditional firearm regulations impose a comparable burden on the right of armed self-defense because both legal regimes ban one manner of carry while permitting another. As noted above, however, the two methods of carry at issue are not equivalent and interchangeable. The antebellum cases and statutes established that open carry, and *only* open carry, fully and properly effectuates the right to armed self-defense contemplated by the second amendment. Thus, Illinois's banning of open carry imposes a far greater burden upon the right to armed self-defense than would a ban on concealed carry.

¶ 109    The State and the majority further contend that the burden upon the right to armed self-defense imposed by Illinois's laws and by traditional historical regulations are "comparably justified" because both sought to reduce violence and promote safety in public places by regulating the manner of the public carry of firearms. The State acknowledges that several

44

nineteenth century statutes and the cases interpreting them attempted to promote public safety by banning concealed carry, which was historically considered to be more dangerous and more likely to lead to violence than was open carry. The State notes that the Illinois General Assembly "made a slightly different policy choice (prohibiting open carriage rather than concealed carriage) than those reflected in historical regulations" "[i]n view of shifting societal preferences and evolving social science." However, the State maintains that this difference is immaterial because both legal regimes sought to promote public safety.

¶ 110      I do not find these arguments to be persuasive. As an initial matter, Illinois did not merely make a "slightly different policy choice" regarding how to protect public safety. It made the *exact opposite* choice than that prescribed in the historical regulations. As noted, during the relevant historical time periods, *no* jurisdiction addressed the problem of gun violence by banning open carry and allowing concealed carry, as Illinois does. To the contrary, it was *concealed* carry, not open carry, that was traditionally banned because it was thought that only concealed carry threatened public safety.

¶ 111      The fact that the problem of gun violence has been addressed so differently throughout the nation's history (and consistently so) *is not* irrelevant. Indeed, it is strong evidence that Illinois's approach *is* unconstitutional. "[W]hen a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id.* at ___, 142 S. Ct. at 2131. "Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional." *Id.* at ___, 142 S. Ct. at 2131.

45

¶ 112    As the State acknowledges, public safety concerns posed by gun violence have existed since the framing. However, *none* of the historical regulations designed to combat that problem adopted the method that Illinois has adopted here. Indeed, the traditional regulations employed the *exact opposite* approach based upon the traditional understanding of the relationship between open carry, concealed carry, and the second amendment's right to armed self-defense. That traditional understanding determines the meaning and scope of the second amendment. Illinois's law categorically banning open carry is therefore unconstitutional. To the extent that *People v. Thompson*, 2023 IL App (1st) 220429-U, suggests (without analysis) that Illinois's categorical ban on open carry is constitutional, it was wrongly decided.

¶ 113    The State and the majority's suggestion that modern day sensibilities and policy preferences may alter or supplant the original meaning and scope of the second amendment is insupportable. As the United States Supreme Court ruled in *Heller*, "the enshrinement of constitutional rights necessarily takes certain policy choices off the table." 554 U.S. at 636. The public understanding of the second amendment during the 70 years following its ratification (including the two decades immediately preceding the enactment of the fourteenth amendment) was that the open carry of firearms in public for self-defense may not be categorically banned. That understanding fixed the meaning and scope of the second amendment, and it may not be overridden merely because it appears outmoded or runs contrary to contemporary policy preferences. See *id.*

¶ 114    The Constitution leaves Illinois a variety of tools for combating the problem of gun violence, including the banning of concealed carry. However, a categorical ban on open carry violates the second amendment and is therefore "off the table." See *id.* If three-fourths of the States want to ban open carry, they may amend the Constitution to reflect their policy

46

preferences. However, they may not simply engraft those preferences into the second amendment by judicial or legislative fiat, thereby disregarding and impermissibly altering the amendment's original public meaning. The determination of whether policies are good or bad is not for the judicial branch of government to decide. Rather, its only job is to interpret the second amendment and to prevent policies which contravene the protections it affords.

¶ 115    In any event, I disagree with the State's assessment that banning open carry would reduce gun violence and promote public safety. The State argues that allowing open carry is bad policy because "common sense dictates, and experience confirms, that the open carriage of firearms makes it more difficult for law enforcement to protect the public." I find this proposition to be contrary *both* to common sense *and* to experience.

¶ 116    The State argues that if law-abiding citizens were allowed to carry firearms openly in public, it would be more difficult for the police to know whether an individual is carrying or using a firearm legally. To the contrary, allowing concealed carry, while banning open carry, is what places both the police and the public at a disadvantage. If an individual is openly carrying a gun, a police officer may approach him and ask him to show proof that he is doing so legally. That cannot be done if the person is carrying a concealed weapon. Concealed weapons also pose a greater threat to the public because they cannot deter would-be criminals, they increase the likelihood that arguments will escalate into violence (including gun violence), and, as the historical authorities recognized, they make it easier for anyone carrying a concealed weapon to ambush another person. As our forebears rightfully concluded, allowing the open carry of firearms is the only way to deter violence or the escalation of violence effectively.

¶ 117    The State further maintains that allowing open carry would cause fear among the public, which is "particularly likely for minority groups." This is so, claims the State, because "hate

47

groups, such as white supremacists, have long openly carried firearms to threaten and intimidate others." There is indeed a shameful history in this country of racist acts of violence and intimidation committed by whites against blacks, particularly in the nineteenth and early twentieth century South. However, this violence was made possible in large part by racist laws that barred blacks from carrying firearms and other weapons for self-defense. See *McDonald*, 561 U.S. at 771 (noting the "systematic efforts" made to disarm blacks); *Bruen*, 597 U.S. at ___, 142 S. Ct. at 2151-53. Disarming blacks was a tool of oppression that enabled whites to commit violence against blacks. Although white-on-black gun violence is far less prevalent in America today, blacks are still victims of gun violence at highly disproportionate rates. See GianCarlo Canaparo & Abby Kassal, *Who Suffers the Most from Crime Wave?*, Heritage Found. (Apr. 12, 2022), https://www.heritage.org/crime-and-justice/commentary/who-suffers-the-most-crime-wave [https://perma.cc/HM4G-2AQL] (relying upon crime data compiled by the FBI). Open carry would empower blacks and members of other minority groups, many of whom live in high crime areas, to defend themselves and to deter criminals of any race from committing acts of violence against them. This may allay any fears that blacks or other minorities might have of others who openly carry firearms. Open carry would be the most effective means to deter any aggression against them.

¶ 118 Regardless, this policy debate is moot because, as noted above, the second amendment forecloses the categorical ban on open carry adopted in Illinois. In determining the meaning and scope of the second amendment, the Supreme Court relies solely upon the text and history of the amendment, not upon a State legislature's or a court's balancing of policy considerations. See *Bruen*, 597 U.S. at ___, 142 S. Ct. at 2129 (stating that *Heller* and *McDonald* "expressly rejected" the application of any "judge-empowering interest-balancing inquiry" that "asks

48

whether the statute burdens a protected interest in a way or to an extent that is out of proportion to the statute's salutary effects upon other important governmental interests" (internal quotation marks omitted)); see also *Heller*, 554 U.S. at 634; *McDonald*, 561 U.S. at 790-791 (the second amendment does not permit—let alone require—judges to "assess the costs and benefits of firearms restrictions" under means-end scrutiny).

¶ 119     To be clear, I am not suggesting that open carry may not be restricted. Reasonable restrictions may be imposed so long as they are consistent with our nation's historical tradition of firearm regulations. Illinois presently requires all persons within the State to obtain a Firearm Owner's Identification card in order to lawfully possess or use a gun. *Bruen* does not suggest that such licensing requirements are unconstitutional. See *Bruen*, 597 U.S. at ___ n.9, 142 S. Ct. at 2138 n.9; *Thompson*, 2023 IL App (1st) 220429-U (rejecting a facial challenge to the constitutionality of the Concealed Carry Act's permitting requirement). The State may impose other reasonable regulations as it sees fit. However, it may not categorically ban the open carry of firearms.

¶ 120     This is an extremely important issue that affects *all* citizens of Illinois as it affects the constitutional right of all citizens to armed self-defense, one of the core rights guaranteed by the second amendment and a bulwark against threats to their safety and liberty.

¶ 121     In determining whether Illinois's categorical ban on open carry violates the second amendment, jurists are bound by the dictates and guidelines of the Supreme Court and our nation's historical tradition of firearm regulation and are prohibited from imposing personal policy preferences under the guise of constitutional interpretation. To do so would violate their oath of office.

*Sinnissippi Rod & Gun Club, Inc. v. Raoul*, 2024 IL App (3d) 210073

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Whiteside County, No. 19-MR-151; the Hon. Patricia Ann Senneff, Judge, presiding. |
| **Attorneys for Appellant:** | Dmitry N. Feofanov, of ChicagoLemonLaw.com, P.C., of Lyndon, for appellants. |
| **Attorneys for Appellee:** | Kwame Raoul, Attorney General, of Chicago (Jane Elinor Notz, Solicitor General, and Priyanka Gupta and Sarah Hunger, Assistant Attorneys General, of counsel), for appellees. |